**Dr. Richard JACKSON, Petitioner,**

v.

**David and Carolyn AXELRAD,
Respondents.**

No. 04–0923.

Supreme Court of Texas.

Argued Feb. 16, 2006.

Decided April 20, 2007.

R. Brent Cooper, Diana L. Faust, Cooper & Scully, P.C., Dallas, Erin E. Lunceford, Joel Randal Sprott, Munisteri, Sprott, Rigby, Newsom & Robbins, P.C., Houston, for Petitioner.

Darrin M. Walker, Law Office of Darrin Walker, Kingwood, George Chandler, Michael Kirk Mathis, Chandler Law Offices, Lufkin, Walter Perry Zivley Jr., Law Offices of W. Perry Zivley Jr., Houston, for Respondents.

Justice BRISTER delivered the opinion of the Court.

In this unusual medical malpractice case, both physician and patient were doc-

tors. Each claimed the other was negligent, and a jury agreed both were. As the jury assessed slightly more fault to the plaintiff (51 percent) than the defendant (49 percent), the trial court entered a take-nothing judgment.[1]

A divided court of appeals reversed and remanded for a new trial, disregarding the finding of the plaintiff's negligence because laymen generally have no duty to volunteer information during medical treatment.[2] But the plaintiff here was not a layman, and jurors judging his actions could consider his expertise, especially as he emphasized it throughout the trial. Because there was some evidence the plaintiff doctor failed to report a critical symptom when he should have, we reverse the court of appeals' judgment and reinstate the jury's verdict.

## I. Background

This suit was brought by Dr. David Axelrad, a psychiatrist, against Dr. Richard Jackson, an internist. Like the court of appeals, we will refer only to the latter by his title to avoid confusion.

After months of intermittent abdominal cramps and diarrhea, Axelrad sought treatment from Dr. Jackson after an abrupt onset of acute pain. Dr. Jackson prescribed a laxative and enema for fecal impaction. As it turned out, Axelrad was suffering from diverticulitis. It is undisputed an enema should not be prescribed in such circumstances due to the risk of a perforated colon.

Returning home, Axelrad followed his doctor's orders and immediately felt severe abdominal pain with nausea, rigors, and chills. His wife took him to an emergency room, and he was hospitalized for further testing. Based on those tests, another doctor operated two days later for what was thought to be appendicitis, but turned out to be diverticulitis and a perforated colon. A portion of the colon was removed and a temporary colostomy constructed. Axelrad's subsequent course of treatment included surgery to reconnect the colon, complicated by a severe drug reaction.

While the foregoing is undisputed, the parties disagree about much else, including (1) what medical history Axelrad reported, (2) when colon perforation occurred, (3) whether it was caused by Axelrad's disease or Dr. Jackson's treatment, (4) why Dr. Jackson did not come to the emergency room, and (5) whether Axelrad's course would have been different had Dr. Jackson's treatment been different. But the only conflict relevant to this appeal is the first. Although he alleged several grounds of contributory negligence at trial,[3] Dr. Jackson now argues only that the court of appeals erred in disregarding evidence supporting one—that Axelrad neglected to report where his abdominal pain began.

The evidence showed that particular diseases are associated with pain in particular places in the abdomen—gallbladder disease in the right upper quadrant, appendicitis in the right lower quadrant, and diverticulitis in the left lower quadrant. While conceding a patient with diverticulitis should not be treated with enemas, Dr. Jackson testified he did not suspect diverticulitis as it is normally associated with fever, constipation, and pain in the left lower quadrant, while Axelrad reported no

---

1. See TEX. CIV. PRAC. & REM.CODE § 33.001 ("In an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent.").

2. 142 S.W.3d 418, 421 (Tex.App.-Houston [14th Dist.] 2004).

3. See id. at 427–28.

fever, diarrhea, and pain throughout his abdomen.

A patient cannot, of course, be negligent because his symptoms fail to fit the usual pattern. But at trial, Axelrad insisted he told Dr. Jackson his pain started in the left lower quadrant. The latter flatly denied it, and argued Axelrad made this claim for the first time at trial. In none of the histories taken by medical personnel during his treatment did Axelrad ever report that his pain began in the left lower quadrant, nor did he say so at his pretrial deposition.

It was up to the jurors to resolve this conflict in the testimony. But as the issues were submitted in broad form, how they decided it depends on what presumption applies when jurors issue a split verdict like they did here.

## II. Presumptions Concerning a Split Verdict

 As we said in *City of Keller v. Wilson*, when there are conflicts in testimony we must presume "jurors decided all of them in favor of the verdict if reasonable human beings could do so." [4] But we also noted that evidence "may support one part of a verdict but not another." [5] Here, one version (that Axelrad reported where his pain began) supports the verdict against Dr. Jackson, while the other version (that he did not) supports the verdict against Axelrad. Reasonable jurors could not have believed both—Axelrad either *did* or *did not* report where his pain began. But because either answer would support

part of the verdict, which one must we presume jurors believed?

The answer turns on the purpose of the presumption. It is not a prediction about what jurors actually did, as they often do not decide all conflicts one way. Here, for example, each party asserted several reasons why the other was negligent, so jurors did not have to agree on any one reason so long as they agreed on the result. [6]

Instead, the presumption serves to protect jury verdicts from second-guessing on appeal. As a result, it operates in favor of any jury finding a litigant asks an appellate court to set aside. Here, the court of appeals set aside only one jury finding— that Axelrad was negligent. To ensure that the appellate court did not substitute its own judgment for that of the jury, we must presume the jury decided all conflicts in favor of this finding. [7]

 There are some cases in which this general rule will not apply. Courts cannot presume findings in favor of one part of a verdict if doing so creates an irreconcilable conflict with another. [8] But that is not the case here, as there was evidence Dr. Jackson was negligent even if Axelrad failed to report all his symptoms. Accordingly, we must presume jurors found Axelrad did not report where his abdominal pain began.

## III. Do Patients Have a Duty to Cooperate in Diagnosis?

We have never addressed whether a patient's failure to give an accurate medical

**4.** 168 S.W.3d 802, 819 (Tex.2005).

**5.** *Id.* at 827.

**6.** *See Dillard v. Texas Elec. Co-op.,* 157 S.W.3d 429, 434 (Tex.2005) ("Under broad-form submission rules, jurors need not agree on every detail of what occurred so long as they agree on the legally relevant result.").

**7.** *See Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 595 (Tex.1999) (holding trial court erred in disregarding jury's contributory negligence finding as some evidence supported it); *Lynch v. Ricketts,* 158 Tex. 487, 314 S.W.2d 273, 276–77 (1958) (same).

**8.** *See Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 677 (Tex.1998).

history can constitute negligence. But in *Elbaor v. Smith*, we recognized "a duty of cooperation which patients owe treating physicians who assume the duty to care for them." [9] There, we held the plaintiff's refusal to take prescribed antibiotics should have been submitted as a question of contributory negligence, not just a failure to mitigate damages.[10] While *Elbaor* concerned cooperation with treatment rather than diagnosis, nothing in the opinion suggests a patient's duty to cooperate applies to only one aspect of medical care.

A medical history, like many aspects of health care, is a cooperative venture requiring active participation by both doctor and patient. A patient's statements to a doctor are critical, so critical they are protected by a privilege and made an exception to the hearsay rule.[11] In most cases, medical care will never even occur unless patients present themselves for treatment and say what hurts. Patients have no duty to diagnose themselves (as doctors are licensed and paid to do that), but neither can they demand treatment for a condition they refuse to disclose. All the trial experts agreed patients have a duty to cooperate in diagnosis by giving an accurate medical history.

■ Of course, there are cases in which a patient's condition is so obvious that cooperation is unnecessary, or so debilitating that it is impossible. But such cases do not suggest there should be no duty to cooperate; they suggest only that a patient's condition may discharge it. Like any reasonable-person standard, a patient's duty to cooperate requires only ordinary care under all the surrounding circumstances.[12]

The court of appeals attempted to limit a patient's duty to cooperate in diagnosis to two instances: (1) responding truthfully to a physician's questions, and (2) volunteering information known to be both significant and unknown to the doctor.[13] While we agree a patient's duty of cooperation could arise in those situations, we do not think it can be limited to them.

We have rejected similar efforts to compartmentalize negligence in rigid categories. For example, we have discarded categories like imminent-peril, last-clear-chance, and assumption-of-the-risk in favor of a general submission of comparative negligence.[14] In products cases, we have refused to limit all allegations of a plaintiff's negligence to assumption of the risk or mere failure to discover a defect, as other kinds of negligence can fall in between.[15]

---

**9.** 845 S.W.2d 240, 245 (Tex.1992).

**10.** *Id.*

**11.** *See* Tex.R. Evid. 509, 803(4).

**12.** *See, e.g.*, State Bar of Tex., Tex. Pattern Jury Charges—General Negligence PJC 3.3 (2006) (providing conduct in emergency is not negligent if it meets standard of ordinary prudence under same or similar circumstances).

**13.** 142 S.W.3d 418, 424–25 (Tex.App.-Houston [14th Dist.] 2004). We reject Dr. Jackson's argument that Axelrad waived any no-duty argument, as Axelrad's post-trial objection preserved his no-evidence complaint. *See Edward D. Jones & Co. v. Fletcher*, 975 S.W.2d 539, 543 (Tex.1998); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex.1992).

**14.** *See French v. Grigsby*, 571 S.W.2d 867, 867 (Tex.1978) (disapproving of last-clear-chance issues in favor of comparative negligence submission); *Davila v. Sanders*, 557 S.W.2d 770, 771 (Tex.1977) (same regarding imminent-peril); *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 758 (Tex.1975) (same regarding assumption-of-the-risk).

**15.** *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 594 (Tex.1999) (disapproving *Keen v. Ashot Ashkelon, Ltd.*, 748 S.W.2d 91 (Tex.1988)).

Given the infinite variety of patients, diseases, and circumstances surrounding medical care, an exhaustive list defining a patient's duty to cooperate cannot be made. The specificity of a doctor's questions and a patient's responses will necessarily depend on many factors—the language skills of each, their specialized knowledge, the length of their relationship, the urgency of the situation, the frequency of previous examinations, the patient's current condition, and so on.

Doctors are paid for their expertise, so diagnosis will always be primarily their responsibility. Thus, we agree with the court of appeals that in most cases an ordinary patient's failure to report the origin of pain will be no evidence of negligence. But we disagree with the effort to confine this duty to precise categories, and turn next to whether this was an ordinary patient.

## IV. Do Physicians As Patients Have a Different Duty?

The primary dispute between the parties in this appeal is whether Axelrad's medical training should be taken into account in evaluating the history he gave. Axelrad did not object to the admission of such evidence; indeed he offered most of it himself. But he argues it cannot be considered in evaluating legal sufficiency because a physician as patient "should not be required to exercise any heightened degree of care above that of an ordinary person."

■ This argument represents a misunderstanding of the nature of the physician-of-ordinary-prudence standard. It is not a higher standard of care (like strict liability, or the high-degree-of-care standard for common carriers [16]) or a lower standard of care (like gross negligence, or the willful-and-wanton standard for emergency care [17]). It is instead the ordinary-care standard, modified to instruct jurors that "under the same or similar circumstances" means they must consider a physician's training. We said so in *Hood v. Phillips,* our seminal case defining a physician's standard of care:

> The burden of proof is on the patient-plaintiff to establish that the physician-defendant has undertaken a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances. *The circumstances to be considered include, but are not limited to, the expertise of and means available to the physician-defendant, the health of the patient, and the state of medical knowledge.* Unless the mode or form of treatment is a matter of common knowledge or is within the experience of the layman, expert testimony will be required to meet this burden of proof.... Although the trial court refused to submit an issue regarding *ordinary negligence,* [the] evidence would raise a question of fact for the jury on the issue of *ordinary negligence* and such issue should have been submitted.[18]

■ The same point is made by the Restatement. Both the First and Second Restatements of Torts summarize the traditional reasonable-person standard as one taking into account both the knowledge

---

16. *See Speed Boat Leasing, Inc. v. Elmer,* 124 S.W.3d 210, 212 (Tex.2003) (holding common carriers to higher degree of care exercised by very cautious and prudent persons); *see also* STATE BAR OF TEX., TEX. PATTERN JURY CHARGES—GENERAL NEGLIGENCE PJC 2.2 (2006).

17. *See* TEX. CIV. PRAC. & REM.CODE § 74.153.

18. 554 S.W.2d 160, 165–66 (Tex.1977) (emphasis added).

and skills of an ordinary person *and* "such superior attention, perception, memory, knowledge, intelligence, and judgment as the actor himself has." [19] Both Restatements include an illustration specifically applying this standard to physicians, even when they are not acting in that capacity:

A is a physician. His child exhibits symptoms which A, because of his previous training and experience, should recognize as indicating that the child has scarlet fever. A fails to recognize them, and permits his child to go to school, where the child communicates the disease to B, another pupil. A is negligent in not recognizing the risk, although if he were a layman he might not be negligent.[20]

This principle—that ordinary prudence under the same or similar circumstances includes a party's expertise—is not limited to physicians. As Prosser and Keeton note, it applies to many other skills:

[I]f a person in fact has knowledge, skill, or even intelligence superior to that of the ordinary person, the law will demand of that person conduct consistent with it. Experienced milk haulers, hockey coaches, expert skiers, construc-

tion inspectors, and doctors must all use care which is reasonable in light of their superior learning and experience, and any special skills, knowledge or training they may personally have over and above what is normally possessed by persons in the field.[21]

In the "expert skiers" case Prosser and Keeton mention, the federal Tenth Circuit noted that an expert-of-ordinary-prudence is merely an application of the reasonable-person standard, not a different one:

It would appear then that in order to satisfy the standard of care, a person having special knowledge must exercise a quantum of care which is commensurate with the circumstances, one of which is his or her special skill and training. An instruction of this kind is not easy to expound in a charge to a jury for the reason that it is capable of creating the impression that a double standard of care exists. In truth there is but one standard, that of reasonable prudence under the circumstances. The decision must be made on the basis of the surrounding circumstances, including the fact that the person involved is an expert.[22]

---

19. *See* RESTATEMENT (SECOND) OF TORTS § 289 (1965):
 The actor is required to recognize that his conduct involves a risk of causing an invasion of another's interest if a reasonable man would do so while exercising
 (a) such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence, and judgment as a reasonable man would have; and
 (b) such superior attention, perception, memory, knowledge, intelligence, and judgment as the actor himself has.
 *See also* RESTATEMENT (FIRST) OF TORTS § 289 (1934).

20. RESTATEMENT (SECOND) OF TORTS § 289 cmt. m, illus. 12; *see* RESTATEMENT (FIRST) OF TORTS § 289 cmt. n, illus. 17.

21. W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON TORTS § 32, p. 185 (5th ed.1984) (citations omitted); *see also, e.g.,* Joseph H. King, Jr., *Reconciling the Exercise of Judgment and the Objective Standard of Care in Medical Malpractice,* 52 OKLA L.REV. 49, 70 (1999) ("General negligence principles commonly require that a person not only exercise reasonable care, but also apply any superior knowledge or skills that he may possess."); John M. Logsdon, *The Rise and Fall of Bystander Recovery for Negligent Infliction of Emotional Distress in North Carolina,* 21 N.C. CENT. L.J. 319, 338 (1995) ("Under traditional tort concepts, an actor who has superior knowledge is required to exercise that knowledge to avoid risk.").

■ We have never applied the physician-of-ordinary-prudence standard to a plaintiff's negligence, but then we have never addressed a medical malpractice claim by a physician. Nor does it appear that any case addressing a patient's failure to give an accurate medical history has ever done so.[23] But generally "[t]he rules which determine the contributory negligence of a plaintiff are ... the same as those which determine the negligence of the defendant."[24] As jurors analyzing the "same or similar circumstances" must consider a physician's special knowledge when a doctor is the defendant, it is hard to see why they should not do so when a doctor is the plaintiff.

■ Axelrad makes the same mistake in arguing that "the charge held Jackson to the standard of a prudent physician, but Axelrad to the standard of a prudent person." The jury questions included a physician-of-ordinary-prudence charge as to Dr. Jackson and a person-of-ordinary-prudence charge as to Axelrad. As there was no objection, legal sufficiency must be examined by this charge.[25] But for the reasons already discussed, a charge asking whether Axelrad exhibited ordinary prudence *under the same or similar circumstances* at least allowed jurors to consider his training, even if it did not instruct them to do so. In its expert-skier case, the Tenth Circuit held a person-of-ordi-

nary-prudence charge was not prejudicial on just this basis.[26] While a charge that prohibited jurors from considering Axelrad's special knowledge might require a different result,[27] this charge did not.

Here, jurors could hardly have overlooked Axelrad's special knowledge, as he emphasized it throughout the trial. Axelrad designated himself as a testifying expert, and gave several expert opinions to the jury. In the first minute he was on the stand, he opined that Dr. Jackson was "a bad doctor," explaining that "I felt compelled to bring this lawsuit against him ... because he's not a good doctor." Axelrad emphasized to the jury that he had passed judgment on other doctors as a member of state medical boards in both California and Texas. He estimated giving more than 150 depositions as an expert in medical negligence cases. While his practice was limited to psychiatry, he denied any unfamiliarity with abdominal complaints, arguing that during his four years as an emergency room physician he had "a lot of opportunities to examine abdomens." Having presented himself to jurors as a person with superior knowledge, he cannot complain that jurors might have taken him at his word.

Moreover, Axelrad insisted he had reported that his pain originated in the left lower quadrant, which he acknowledged was a classic sign of diverticulitis. As defense counsel put it with some embell-

---

**22.** *La Vine v. Clear Creek Skiing Corp.*, 557 F.2d 730, 734 (10th Cir.1977).

**23.** *See* Carroll J. Miller, Annotation, *Patient's Failure To Reveal Medical History To Physician As Contributory Negligence or Assumption of The Risk in Defense of Malpractice Action*, 33 A.L.R.4th 790 § 3 (1984).

**24.** RESTATEMENT (SECOND) OF TORTS §§ 289 cmt. a, 464; *see* RESTATEMENT (FIRST) OF TORTS §§ 289 cmt. a, 464.

**25.** *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000).

**26.** *La Vine*, 557 F.2d at 734; *accord, Sinai v. Polinger Co.*, 498 A.2d 520, 531–32 (D.C. 1985).

**27.** *See, e.g., Cervelli v. Graves*, 661 P.2d 1032, 1037 (Wyo.1983) (holding charge erroneously instructed jurors not to consider defendant's training as professional truck driver).

ishment in his opening argument, "our grandmothers could all diagnose diverticulitis if you came in and said, 'I have left lower quadrant pain.'" Taking this position strengthened Axelrad's case against Dr. Jackson if jurors credited it. But if they did not, it strengthened an inference that he failed to exercise ordinary care when he failed to mention it.

■ The court of appeals pointed out that Axelrad never admitted knowing the significance of where his abdominal pain started.[28] But of course litigants rarely admit negligence on their own part. The question here is whether there was evidence from which reasonable jurors could infer Axelrad either knew *or should have known* he needed to report this information.[29]

The court of appeals also found it implausible that a sick patient would fail to report a significant symptom,[30] but it is no more implausible than that a doctor would fail to avoid harming a patient and getting sued. The defense presented evidence that haste and impatience sometimes caused Axelrad to downplay his symptoms, fail to follow doctors' orders, and testify to checkups that in fact never occurred. Whether plaintiffs or defendants, people sometimes make mistakes, and it is generally up to the jury to decide who did.[31]

Again, there will be cases in which a patient is a doctor with no special knowledge of a particular disease, or so sick as to be unable to use it. But whether either was the case here was hotly disputed. While Dr. Jackson asked only general questions about Axelrad's condition ("Tell me exactly what is going on"), we cannot say he was required to ask a fellow physician the same questions he would ask everyone else. Similarly, while most patients might not be expected to volunteer where the pain began, we cannot say Axelrad was not required to say something more. As there was evidence from which jurors could have found both doctor and patient were at fault in diagnosing this situation, we hold the court of appeals erred in disregarding one part of the jury's verdict.

## V. Other Points and Conclusion

■ Axelrad asserts two cross-points. In the first, he argues there was no evidence any failure to report where his pain began proximately caused his injuries. But Axelrad's own expert testified "the only reasonable explanation" for the colon perforation and subsequent events was "the administration of that enema." Dr. Jackson testified had he known Axelrad's pain began in the left lower quadrant, he would have suspected diverticulitis and not prescribed an enema. Accordingly, jurors could have found a causal connection.

Second, Axelrad argues the trial court erred by admitting unreliable testimony by Dr. Mary Schwartz, a board certified pathologist who holds an endowed chair at Baylor Medical School, that tissue samples from Axelrad's first surgery showed his bowel perforation had occurred before he ever called Dr. Jackson. While Dr. Schwartz admitted she was unfamiliar with the disease process of diverticulitis, we agree with the court of appeals' detailed

**28.** 142 S.W.3d 418, 427 (Tex.App.-Houston [14th Dist.] 2004).

**29.** *Cf. Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 383 (Tex.1995) (applying standard of what reasonable user should have known, despite plaintiff's denial he knew of danger).

**30.** 142 S.W.3d at 429.

**31.** *City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex.2005) (noting that jurors "may choose to believe one witness and disbelieve another").

analysis that her opinions were reliable,[32] and thus do not repeat them.

Accordingly, for the reasons stated above we reverse the court of appeals' judgment and remand to that court for factual sufficiency review.