IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 05-0386
════════════
 
Providence Health Center 
a/k/a Daughters of Charity Health Services of Waco and DePaul 
Center a/k/a Daughters of Charity 
Health Services of Waco, Petitioners, 
 
v.
 
Jimmy and Carolyn Dowell, 
Individually and on Behalf of the Estate of Jonathan Lance Dowell, 
Deceased,
Respondents
 
-consolidated 
with-
 
════════════
No. 05-0788
════════════
 
James C. Pettit, 
D.O.,
Petitioner,
 
v.
 
Jimmy and Carolyn Dowell, 
Individually and on Behalf of the Estate of Jonathan Lance Dowell, 
Deceased,
Respondents
 
════════════════════════════════════════════════════
On Petitions for Review from the
Court of Appeals for the Tenth District of 
Texas
════════════════════════════════════════════════════
 
            
Justice O’Neill filed a 
dissenting opinion, in which Chief 
Justice Jefferson and 
Justice Medina joined.
 
            
Lance Dowell was brought to the emergency room by police after he 
attempted suicide by slitting his wrist severely enough to require stitches, hid from police officers in the woods all night, 
and told police officers repeatedly that he would try to kill himself again. 
Despite these circumstances and the presence of a number of high risk factors — 
including past hospitalization for attempted suicide, another possible suicide 
attempt earlier that week, and a family history of severe depression — the 
hospital discharged Lance within three hours with no psychiatric treatment and 
instructed him to return for a follow-up exam in three days. Lance committed 
suicide thirty-three hours later. Lance’s family presented expert evidence that 
the suicide-risk assessment performed in the emergency room was so cursory and 
incomplete as to breach the standard of care and that, had the proper assessment 
been performed, the standard of care would have required different treatment to 
be prescribed. The Court does not dispute the providers’ negligence and 
acknowledges that the doctor and nurse failed to comprehensively assess Lance’s 
suicide risk. ___ S.W.3d ___, ___. Nevertheless, the 
Court concludes there is no evidence of causation and reverses the trial court’s 
judgment. To reach that result, the Court constructs new legal hurdles that are 
insurmountable, particularly when, as here, the provider’s alleged negligence 
results in death. Because the Court misapplies the law and disregards relevant 
evidence, I respectfully dissent.
            
A proper legal-sufficiency review requires courts to credit favorable 
evidence if reasonable jurors could, and disregard contrary evidence unless 
reasonable jurors could not. City of Keller v. Wilson, 168 
S.W.3d 802, 827 (Tex. 2005). To establish liability 
based on medical negligence, a plaintiff must demonstrate that a legal duty 
exists, the duty was breached, and the breach in reasonable medical probability 
caused the injury. See IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. 
Mason, 143 S.W.3d 794, 798 (Tex. 2003); Park Place Hosp. v. Estate of 
Milo, 909 S.W.2d 508, 511 (Tex. 1995). The Court concludes the Dowells failed to prove causation because no evidence was 
presented that Lance could have been hospitalized if he had been properly 
diagnosed or that hospitalization would have made his suicide improbable. The 
Court also concludes that the suicide was too remote from the negligent 
discharge to constitute legal cause. I disagree.
            
All of the expert testimony at trial indicated that Lance’s medical 
assessment failed to take into consideration significant suicide risk factors. 
Lance’s examination lasted only two to three minutes, even though the Dowells’ expert testified it takes most professionals an 
hour to do a comprehensive and competent risk assessment for suicide and to 
evaluate the patient adequately. Moreover, the suicide assessment record that 
was made was wrong, indicating Lance had never before attempted suicide when 
clearly he had and the Center had ready access to that information. The Dowells’ expert testified that nearly all of the overlooked 
risk factors, including a family history of hospitalization for depression and 
suicidal ideation and Lance’s suicidal behavior days before, pointed toward a 
high risk that Lance would commit suicide. That expert concluded: “I think based 
on the inadequate risk assessment for suicide that was done on Lance, that he should have been admitted to the hospital or a 
psychiatrist should have been called. I think that . . . it was erroneous for 
[the emergency room doctor] to discharge him at that time.” When asked whether 
that error rose to a breach of the standard of care, the expert responded that 
it did. The expert reiterated that point in later testimony, explaining that 
because a proper evaluation would have found that “Lance was at high risk of 
killing himself,” the standard of care required that he be provided some form of 
psychiatric treatment before discharge.
            
Yet the Court holds that the jury’s verdict cannot stand because the 
Dowells failed to prove that, had Lance been properly 
diagnosed, he would have voluntarily submitted to hospitalization or could have 
been involuntarily retained. However, nothing in our jurisprudence requires them 
to do so. Today, the Court adds a causative element to a patient’s burden when a 
health care provider negligently fails to diagnose or diagnoses improperly, 
requiring the patient to demonstrate that he would have followed appropriate 
medical advice had it been given. In cases like this, where the patient dies as 
a result of the alleged negligent treatment, that burden could never be met, as such testimony would surely be excluded as 
speculative. See Int’l & Great N. R.R. Co. v. White, 131 S.W. 811, 
812 (Tex. 
1910) (holding that a witness may not testify as to what a deceased person would 
have done because such testimony is mere speculation); see also Tex. R. Evid. 602; 
Tex. R. Evid. 701.
            
Though we have never required a health care liability plaintiff to prove 
he would have followed a doctor’s proper diagnosis and recommended treatment had 
it been made, we do require a plaintiff who alleges lack of informed consent to 
show that a reasonable person would have refused consent had the risks been 
explained. McKinley v. Stripling, 763 S.W.2d 407, 410 
(Tex. 
1989). The Dowells presented evidence that a 
reasonable person similarly situated would have consented to hospitalization. 
The evidence presented indicated that suicidal patients generally consent to 
hospitalization when it is properly advised. All three of the Dowells’ experts testified that, in their experience, all or 
nearly all of their patients agree to hospitalization when the consequences of 
not doing so are explained. In sum, the Dowells 
presented evidence that a reasonable person in Lance’s position would have 
agreed to hospitalization, and there is no legal support for requiring more.
            
The Court concludes that Lance’s statement that he would rather not stay 
negates the experts’ testimony. However, unlike the patients described in the 
experts’ testimony, Lance was never advised to stay. There is no evidence that, 
had it been explained to Lance that it was in his best interest to stay, he 
would have refused. If anything, the nurse in this case appeared to 
discourage Lance’s hospitalization, advising his mother that a stay 
“would just run up a big bill” and admonishing Lance that he should have 
insurance. And although Lance’s mother was present when the nurse instructed him 
to stay with his parents, she testified that the nurse never gave her any 
instructions with regard to Lance’s care. The written “instructions” Lance 
received were cursory and stated in their entirety: “Be seen at MHMR on Tuesday. 
Stay w/ parents until seen & assessed by counselor.” This evidence, a 
reasonable factfinder could have concluded, likely 
indicated to Lance and his mother that his condition did not warrant serious 
immediate concern. Because Lance was never properly advised, we cannot know 
whether he would have consented to treatment, and nothing in our jurisprudence 
requires such a showing.
            
The Court further concludes there is no evidence that hospitalization 
would have made Lance’s suicide “unlikely.” ___ S.W.3d at 
___. Yet the Dowells’ expert testified, as the 
Court acknowledges, that the probable outcome of hospitalization would be that 
Lance’s risk of suicide would be significantly lowered. The expert went on to 
explain that a significant drop in suicide risk occurs after treatment in ninety 
to ninety-five percent of patients in Lance’s situation and that, with proper 
treatment, suicidal ideation passes after twenty-four to ninety-six hours. As 
the Dowells’ expert noted, Lance’s prior suicide 
attempt and emergency room visit were under very similar circumstances. Then, 
Lance was admitted for six days and no further suicidal episodes occurred until 
this one two years later. The Dowells’ expert 
considered that “if [Lance] were admitted this time, most likely, the same 
outcome would have occurred.” In my view, the Dowells 
presented some evidence that, in reasonable medical probability, Lance’s suicide 
would have been prevented but for the providers’ negligence, which is all that 
the law requires. See Park 
Place Hosp., 909 S.W.2d at 
511.
            
Citing our decision in IHS Cedars Treatment Center of Desoto, Texas v. 
Mason, the Court concludes as a matter of law that Lance’s suicide was too 
attenuated from the providers’ negligence for causation to exist. See 
143 S.W.3d at 794. In IHS Cedars, the 
plaintiff was discharged from a mental-health facility along with a fellow 
patient who had allegedly befriended her and asserted unnatural influence over 
her. Twenty-eight hours after their discharge, the plaintiff was riding in the 
friend’s car when the friend experienced a psychotic episode that caused her to 
speed and drive erratically. When a dog ran out in front of the car, the friend 
swerved to avoid it and crashed the car, causing plaintiff’s injuries. We held 
the chain of causation was too remote for liability purposes because the 
defendants could not have foreseen at the time of plaintiff’s discharge that she 
would later be riding with the friend, who would experience a psychotic episode, 
drive fast, and swerve to avoid an animal that ran out into the road. Unlike 
IHS Cedars, in this case there was a causal connection between Lance’s 
negligent treatment and his later injury. Lance was taken to the emergency room 
precisely because he had attempted suicide. The Dowells alleged, the jury found, and the health care 
providers no longer contest that the providers were negligent in not properly 
assessing and treating Lance’s suicide risk. The experts testified that when he 
was discharged, “Lance was at high risk of killing himself.” That high risk 
became a reality thirty-three hours later. On this record, I simply cannot agree 
that Lance’s suicide was so attenuated from the providers’ negligence as to 
vitiate causation as a matter of law. In addition, there was no intervening 
tortious conduct here. The Court implies that Lance’s 
family was contributorily negligent in letting Lance 
out of their sight. But parents have no legal duty regarding the behavior of 
their adult children. Villacana v. Campbell, 
929 S.W.2d 69, 75 (Tex. App.—Corpus Christi 1996, writ denied). In any 
event, Lance’s parents’ ability to supervise and assess his behavior more 
properly speaks to whether the providers breached the standard of care. As the 
Dowells’ expert explained, given that Lance’s brother 
and the police had been unable to keep Lance safe the night before he visited 
the emergency room, it was a breach of the standard of care to believe his 
parents would have been able to effectively do so. Furthermore, the fact that 
Lance showed no signs of his impending suicide that were discernible to his 
family is precisely why the intervention of trained mental-health professionals 
is so important. Although Lance’s mother was a nurse, she had no training or 
experience with mental-health patients or in identifying the indicia of severe 
depression. She relied upon the nurse’s assessment, and only a proper medical 
evaluation could have revealed the severity of Lance’s illness. Lance’s family 
was not an adequate substitute for professional care. Thus, releasing Lance into 
the care of his family could not have been an intervening cause.
            
Finally, by imposing additional evidentiary burdens on mental-health 
patients when improper diagnosis leads to death, the Court seems to imply that 
suicide is simply not preventable. This premise, however, is contrary to the 
Civil Practice and Remedies Code, Section 93.001(a)(2), 
which provides: “if the suicide or attempted suicide was caused in whole or in 
part by a failure on the part of any defendant to comply with an applicable 
legal standard, then such suicide or attempted suicide shall not be a defense.” 
Tex. Civ. Prac. & Rem. Code § 
93.001(a)(2).
            
Recognizing that the statute precludes an affirmative defense of suicide 
when, as here, an applicable legal standard has been breached, Justice Wainwright would nonetheless 
require the jury to assess and allocate Lance’s proportionate responsibility. 
According to Justice Wainwright, 
Lance’s failure “to take a prescribed medication and remain with family members” 
could be a contributing cause of his death “apart from the act of committing 
suicide . . . .” ___ S.W.3d at ___. Under such an 
approach, a factfinder would have to somehow separate 
Lance’s suicide from the events leading to his suicide. However, I find it 
unlikely that, in drafting the statute, the Legislature intended parties who 
breached the standard of care to be absolved from liability because the act of 
isolating one’s self in order to commit suicide is somehow separable from the 
act of suicide itself. Notwithstanding the difficulties inherent in requiring 
the factfinder to divorce actions leading to suicide 
from the actual event, there is no factual support for such a submission in this 
case. Undisputed evidence indicates that the medication Lance was prescribed was 
to help him sleep, not specifically to treat his psychiatric needs. In addition, 
the Dowells’ expert testified at length about 
“no-suicide” contracts and similar instructions to and agreements with patients. 
He opined that such agreements are generally ineffective at preventing suicide 
unless they are part of an inpatient treatment plan. The expert stated that it 
was “foolish” to expect a patient at a high risk of suicide to comply with a 
“no-suicide” contract or other post-release instructions relating to suicide 
prevention. He explained that “the debilitating effect of depression on a 
person’s mental processes” inhibits an individual’s ability “to use self-control 
and good judgment,” and that an impulsive suicidal patient such as Lance would 
be at risk for violating any promises about his post-release behavior. This 
would include following the providers’ terse instruction to “[s]tay w/ parents.” Justice Wainwright’s approach would attribute 
causation for breach of a mental health standard of care to the patient whose 
undiagnosed mental impairment was the very cause of injury, which is clearly 
contrary to the statute’s intent. See Tex. Civ. Prac. & Rem. Code § 
93.001(a)(2). The providers’ release of Lance with only 
a few words of generalized instruction breached the standard of care precisely 
because Lance could not be expected to follow it. The cases Justice Wainwright cites for support do not concern patients with mental illness whose 
abilities to comply with treatment plans were substantially impaired. See 
Jackson v. Axelrad, 
221 S.W.3d 650 (Tex. 2007); Elbaor v. Smith, 845 S.W.2d 240 (Tex. 1992).
            
In sum, I do not agree that the evidence in this case is legally 
insufficient or the injury too attenuated to support the jury’s findings, or 
that the case was improperly submitted, and would affirm the judgments of the 
trial court and the court of appeals. Because the Court does not, I respectfully 
dissent.
 
            
            
            
            
            
            
___________________________________
            
            
            
            
            
            
Harriet O’Neill
            
            
            
            
            
            
Justice
 
OPINION DELIVERED: May 23, 
2008