

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-05-350-CV

MARGARET YOUNG, INDIVIDUALLY AND          APPELLANT
AS REPRESENTATIVE OF THE ESTATE OF
WILLIAM R. YOUNG

V.

VENKATESWARLU THOTA, M.D. AND          APPELLEES
NORTH TEXAS CARDIOLOGY CENTER

------------

### FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

------------

## OPINION

------------

Appellant Margaret Young, individually and on behalf of the estate of her deceased husband, William R. ("Ronnie") Young, appeals from an adverse jury verdict on her medical malpractice claim against Venkateswarlu Thota, M.D. and his employer, North Texas Cardiology Center (NTCC), in connection with

their treatment during Ronnie's cardiac catheterization. We reverse and remand for a new trial.

## Factual Background

Appellant is Ronnie's widow. Ronnie died on March 10, 2005. Ronnie had suffered from a blood disorder called Polycythemia Vera (PV) and coronary artery disease, including hypertension and angina. His cardiologist, Dr. Thota, with NTCC (collectively "appellees"), recommended that Ronnie undergo a cardiac catheterization to evaluate his heart condition. The catheterization was scheduled for March 4, 2002 at United Regional Health Care System in Wichita Falls, Texas. Dr. Thota performed the procedure that morning, and Ronnie was discharged that afternoon. At the time, Ronnie was fifty-five years of age.

After Ronnie began feeling poorly at home and fell from his chair around 11:45 p.m., appellant called 911, and Ronnie returned to the hospital's emergency room around 1:15 a.m. Olyn Walker, M.D. ultimately operated on Ronnie that night to repair a tear in his iliac artery and the resulting internal bleeding allegedly caused by the catheterization procedure. During the emergency surgery, Dr. Walker discovered a large hematoma from severe bleeding in the peritoneal cavity. After the surgery, Ronnie was placed on a ventilator, suffered acute renal failure that required dialysis, received multiple blood transfusions, underwent a splenectomy, and underwent surgery to

2

remove his gallbladder once it became gangrenous due to ischemia caused by the bleed. He ultimately lost vision in one eye and suffered numerous strokes and blood clots, all allegedly as a result of the negligent catheterization. Ronnie stayed in the hospital in Wichita Falls for two months and later transferred to Baylor University Medical Center (BUMC) in Dallas, Texas, on May 2, 2002. While at BUMC, he was diagnosed with and treated for thrombocytosis, sepsis, respiratory failure, depression, malnourishment, gout, deep vein thrombosis, and portal vein thrombosis. When he left BUMC, he went to Baylor Specialty Hospital for rehabilitation for an additional two months. Ronnie died on March 10, 2005, about three years after the original procedure, at the age of fifty-eight.

After Ronnie died, appellant brought suit individually and on behalf of his estate against Dr. Thota and NTCC.[1] Appellant alleged appellees were negligent in failing to obtain an accurate medical history on Ronnie, in failing to take into consideration any of Ronnie's pre-existing conditions that might have exacerbated potential complications, in failing to properly locate the femoral artery and lacerating the right iliac artery instead during the catheterization, in

---

[1] NTCC's alleged liability was based solely on respondeat superior.

failing to discover the laceration before discharging Ronnie, and in failing to properly diagnose and treat the tear.

In response, appellees contended that Ronnie's injuries were the result of an unavoidable accident; in other words, they were no one's fault. Alternatively, they contended that his injuries were the result of a new and independent cause or the result of pre-existing conditions or subsequent conditions. Appellees also contended that the occurrence was the result of Ronnie's comparative negligence under chapter 33 of the civil practices and remedies code and asserted a counterclaim against Ronnie for contribution and for his alleged failure to mitigate his damages. Appellees' defenses and counterclaims generally focused on their claims that Ronnie's injuries were a result of his pre-existing conditions, as well as Ronnie's failure to follow his discharge instructions.

The trial court submitted issues on appellees' negligence and Ronnie's contributory negligence and further gave the jury inferential rebuttal instructions on new and independent cause and unavoidable accident.[2] In a ten to two

---

[2] The trial court gave the jury an inferential rebuttal instruction on new and independent cause and unavoidable accident as to Dr. Thota but only gave Ronnie an inferential rebuttal instruction on unavoidable accident.

4

verdict, the jury found that only Ronnie was negligent and awarded neither Ronnie's estate nor appellant any damages.

## Issues on Appeal

In four issues, appellant challenges the sufficiency of the evidence to support the jury's answers to Question One, complains that the trial court erred by submitting Ronnie's contributory negligence to the jury within this question, and contends that the trial court erred by submitting jury instructions on unavoidable accident and new and independent cause.

## Claimed Jury Charge Error

First, we address those issues claiming jury charge error. We address the propriety of the trial court's charge regarding Ronnie's contributory negligence first because that issue is potentially dispositive of the appeal and could give appellant the greatest relief. *See* Tex. R. App. P. 47.1; *see generally VanDevender v. Woods,* 222 S.W.3d 430, 433 n.9 (Tex. 2007); *West v. Robinson,* 180 S.W.3d 575, 576–77 (Tex. 2005); *Profitlive P'ship v. Surber,* 248 S.W.3d 259, 262 (Tex. App.—Fort Worth 2007, no pet.); *id.* at 263 (Walker, J., concurring and dissenting).

### Standard of Review

Rule 277 requires a trial court, whenever feasible, to submit a cause in broad-form questions. Tex. R. Civ. P. 277. Rule 278 requires a court to submit

5

instructions and definitions to the jury as are necessary to enable the jury to render a verdict. Tex. R. Civ. P. 278; *Goose Creek Consol. ISD v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 499 (Tex. App.—Texarkana 2002, pets. denied). Inferential rebuttal questions are not to be submitted to a jury; only instructions and definitions may be given. Tex. R. Civ. P. 277. We review claimed jury charge error for an abuse of discretion*. In re V.L.K.,* 24 S.W.3d 338, 341 (Tex. 2000); *Goose Creek*, 74 S.W.3d at 499; *see also Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex. 1990). If the pleadings and evidence raise the issue, a party is entitled to a jury question, instruction, or definition on the matter. Tex. R. Civ. P. 278; *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002).

**The Charge**

In her issues, appellant focuses on charge error that she claims occurred in the first jury question and the challenged definitions. Question One asked, as to both appellee, Dr. Thota, and Ronnie:

> Did the negligence, if any, of those named below, proximately cause the injury in question, if any?
>
> "Negligence," when used with respect to the conduct of Venkat Thota, M.D., means failure to use ordinary care, that is, failing to do that which a cardiologist of ordinary prudence would have done under the same or similar circumstances or doing that which a cardiologist of ordinary prudence would not have done under the same or similar circumstances.

6

"Ordinary care," when used with respect to the conduct of Venkat Thota, M.D., means that degree of care that a cardiologist of ordinary prudence would use under the same or similar circumstances.

"Proximate Cause" when used with respect to the conduct of Venkat Thota, M.D., means that cause which, in a natural and continuous sequence unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a cardiologist using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

*"New and independent cause," when used with respect to the conduct of Venkat Thota, M.D., means the act or omission of a separate and independent agency, not reasonably foreseeable by a cardiologist exercising ordinary care, that destroys the causal connection, if any, between the act or omission inquired about and the injury in question and thereby becomes the immediate cause of such injury.*

"Negligence," when used with respect to the conduct of [Ronnie] Young means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of [Ronnie] Young means that degree of care that a person of ordinary prudence would use under the same or similar circumstances.

"Proximate cause," when used with respect to the conduct of [Ronnie] Young means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a

7

person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

*An injury may be an "unavoidable accident," that is, an event not proximately caused by the negligence of any party to it.*

Answer "Yes" or "No".

Venkat Thota, M.D.:                                    [NO]

[Ronnie] Young:                                    [YES]

[Emphasis added.]

The next jury question conditionally asked about Dr. Thota's and Ronnie's comparative (percentage) negligence but was not answered because of the jury's answer to the first question.

**Contributory Negligence versus Mitigation of Damages**

In part of her second issue, appellant complains of charge error in the submission of Ronnie's claimed contributory negligence instead of an instruction on Ronnie's duty to mitigate his damages. When considering the propriety of submitting a plaintiff's contributory negligence as opposed to a plaintiff's failure to mitigate his or her damages, we are to consider whether the alleged negligence "merely increases or adds to the extent of the loss or injury occasioned by another's negligence," in which case submission of an instruction on mitigation of damages would be appropriate as opposed to a

8

contributory negligence question. *Elbaor v. Smith*, 845 S.W.2d 240, 245 (Tex. 1992) (citing *Kerby v. Abilene Christian Coll.*, 503 S.W.2d 526, 528 (Tex. 1973)).

The mitigation of damages doctrine requires an injured party to "exercise reasonable care to minimize its damages if damages can be avoided with only slight expense and reasonable effort." *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 708 (Tex. App.—Fort Worth 2006, pet. denied). As noted by the Texas Supreme Court in *Moulton v. Alamo Ambulance Serv., Inc.*, the injured person's failure

> to care for and treat his injuries as a reasonable prudent person would under the same or similar circumstances was 'a branch of the doctrine of contributory negligence['] . . . only in the sense that damages resulting from such failure are ultimately not proximately caused by the wrongdoer's acts or omissions, but by the injured person's own *subsequent* negligence.

414 S.W.2d 444, 449 (Tex. 1967) (emphasis added) (quoting *Gulf, C. & S.F. Ry. Co. v. Mannewitz*, 70 Tex. 73, 8 S.W. 66, 67 (1888)). In *Moulton*, the court noted that the plaintiff's failure to follow competent medical advice aggravated the injuries he sustained in a collision and thus allowed submission of an instruction on failure to mitigate damages as opposed to one on contributory negligence. *Id.* at 448–49.

"Contributory negligence goes to the proximate cause of the original incident." *Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220, 226 (Tex.

9

App.—San Antonio 1999, no pet.). "Mitigation of damages, on the other hand, arises from [the injured party's] separate duty to act reasonably in reducing his damages." *Id*.; *see also Harris County v. Smoker*, 934 S.W.2d 714, 721 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (summarizing *Moulton's* holding that an instruction on mitigation of damages is appropriate when there is evidence of negligence on the part of the plaintiff in failing to consult a doctor, in doing so untimely, in failing to follow a doctor's advice, or in not caring for and treating injuries that do not require a doctor's attention).

The party that asserts the injured party's failure to mitigate has the burden of proving the failure to mitigate and must show the extent to which the damages were increased by the failure to mitigate. *Cotten*, 187 S.W.3d at 708; *U.S. Rest. Props. Operating L.P. v. Motel Enters., Inc.,* 104 S.W.3d 284, 293 (Tex. App.—Beaumont 2003, pet. denied).

In *Kerby,* the plaintiff driver suffered injuries when the defendant's school bus ran a red light and struck him. 503 S.W.2d at 527. The plaintiff, driving a linen van, was thrown from his van through its open sliding door when it was struck. *Id.* The van landed on him, and he suffered injuries. *Id.* At trial, the court submitted questions to the jury inquiring of the plaintiff's potential contributory negligence in leaving his van door open. *Id.* The jury answered affirmatively, finding the plaintiff thirty-five percent negligent in causing the

accident. *Id.* The trial court entered judgment in the plaintiff's favor on the jury's verdict but reduced the amount of damages it found by the percentage of negligence attributable to the plaintiff. *Id.* The appeals court reversed the trial court's judgment and rendered judgment solely in favor of the defendant, concluding that the special issues inquiring of plaintiff's negligence in leaving the van door open constituted findings of contributory negligence and proximate cause, requiring a complete defense verdict.[3] *Id.* The supreme court reversed both the trial court's judgment and the court of appeals's judgment and rendered judgment for the plaintiff for the entire amount of damages assessed by the jury, unreduced by the percentage of negligence it attributed to the plaintiff. *Id.* at 529. The supreme court held, "Even if there were proof that the particular injury suffered would not have been suffered had Kerby avoided being thrown from his truck, it would not support the jury's finding of percentage contribution." *Id.* The court noted, "Negligence which merely increases or adds to the extent of the loss or injury occasioned by another's negligence is not such contributory negligence as would defeat recovery." *Id.*

---

[3] When *Kerby* was tried in June 1973, our current system of inquiring into the comparative fault of the parties had not yet been created; a finding of contributory negligence on the part of a plaintiff constituted a bar to a plaintiff's recovery, unlike an affirmative finding on a mitigation question. *See* Tex. R. Civ. P. 277, 493-494 S.W.2d (Tex. Cases) xxxii–iii (1973, amended 1987); *see also Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 529 (Tex. 1995); *cf.* Tex. Civ. Prac. & Rem. Code Ann. §§ 33.001–.017 (Vernon 2008).

11

at 526. Thus, the supreme court held that the trial court erroneously included an issue on the plaintiff's alleged contributory negligence instead of a mitigation instruction. *Id.* at 528.

Alternatively, in *Elbaor*, plaintiff Smith, who had also been injured in an automobile accident, went to a hospital for treatment for her multiple injuries, including a bleeding, compound ankle fracture. 845 S.W.2d at 241–42. She underwent emergency surgery to stop the bleeding, and she remained under the admitting doctor's care for the first week. *Id.* at 242. She transferred to a different hospital and was then under the care of James E. Elbaor, M.D., an orthopedic surgeon, among others, including an infectious disease specialist, who put her on intravenous antibiotics. *Id.* While there, she also underwent two wound debridements in an effort to stop any infection in her ankle. *Id.* A few weeks later, she was transferred to another hospital where her then physician removed a two-inch section of bone from her ankle. *Id.* Despite continued treatment over the next three years, her ankle ultimately became fused. *Id.*

While settling with some of the providers, she went to trial against Dr. Elbaor and Dr. Syrquin, one of her other treating physicians, and the jury returned a substantial verdict in her favor, allocating eighty-eight percent of the liability to Dr. Elbaor and twelve percent to Dr. Syrquin. *Id.* Whether Smith's

ankle was infected was hotly contested at trial, but evidence showed that she had been uncooperative and had refused to follow some of her doctors' instructions concerning her antibiotic medications and traction. *Id.* The trial court refused to submit Dr. Elbaor's requested question on Smith's contributory negligence, finding the evidence insufficient to support the submission of the issue and, instead, instructed the jury on its right to consider Smith's failure to mitigate damages.[4] *Id.* at 245. On appeal, Dr. Elbaor challenged, among other things, the trial court's failure to submit his requested issue on Smith's contributory negligence. *Id.* at 244. The appellate court agreed with the trial court and affirmed its decision to instruct only on mitigation based on *Kerby*. *Id.* at 244–45. The Texas Supreme Court reversed, however, concluding that the facts in *Elbaor* were distinguishable from *Kerby* and required the submission

---

[4] The trial court refused Dr. Elbaor's requested question on Smith's contributory negligence and instead instructed the jury "to exclude from its verdict any damages attributable to Ms. Smith's negligence. This instruction contained no definition of negligence upon which the jury could have based its decision." *Elbaor,* 845 S.W.2d at 245. The instruction read,

> Do not include any amount for any condition resulting from the failure, if any, of Carole Mercer Smith to have acted as a person of ordinary prudence would have under the same or similar circumstances in caring for herself and cooperating in the treatment of her injuries, if any, that resulted from the medical care made the basis of the lawsuit.

*Id.* at 245 n.8.

13

of the plaintiff's contributory negligence as opposed to only an instruction addressing her failure to mitigate her damages. *Id.* at 245. The Texas Supreme Court pointed to the distinction exemplified in *Kerby*: we look to whether the plaintiff's conduct contributed to the accident or occurrence or only increased the injuries suffered. *Id.* "Contributory negligence must have the causal connection with the accident that but for the conduct the accident would not have happened." *Kerby*, 503 S.W.2d at 528.

In reviewing rules 277 and 278, the court in *Elbaor* noted that trial courts are required to submit requested questions if the evidence supports them. 845 S.W.2d at 243. First, the court considered whether any evidence existed showing that Smith's refusal to take antibiotics preceded the onset of infection to her ankle. *Id.* Finding such evidence to exist, the court next noted some of the factual distinctions between the *Elbaor* case and the *Kerby* case. *Id.* For example, it observed that driving with a van door open was not "intrinsically harmful" or a "breach of a legal duty" as opposed to the doctor-patient relationship in *Elbaor* that presupposes a "duty of cooperation which patients owe treating physicians who assume the duty to care for them." *Id.* at 245. Perhaps more importantly, the *Kerby* court noted that having the van door open did not actually contribute to the vehicular accident, the basis for the suit, "rather, it only increased the *injuries* suffered in the accident." *Id.* Conversely,

14

in the *Elbaor* case, the "accident" or "occurrence" at issue in the suit was Smith's infected ankle (as opposed to the original vehicular accident that caused her original compound ankle fracture), and her conduct contributed to or even resulted in the infection. *Id.* While the "accident" or "occurrence" in *Kerby* would have happened with or without the van door being left open, the "infected ankle" that Smith claimed Elbaor's malpractice caused might not have occurred had Smith simply followed her doctor's instructions. *Id.* Therefore, the supreme court held that the trial court's submission of an instruction on mitigation of damages instead of a question on Smith's alleged contributory negligence was error and reversed and remanded for a new trial. *Id.* at 241.

In Ronnie's case, the "injury," "accident," or "occurrence" was the tear in the artery and the damages were the resulting peritoneal bleed. The issue was what or who caused the tear. Appellant's theory was that Dr. Thota made the catheterization incision too high so that sufficient clotting at the site never occurred. Appellant contended that the bleeding into Ronnie's abdomen would not have occurred if Dr. Thota's incision had been made at or below the inguinal ligament. Specifically, Appellant argued that if the puncture site had been properly placed, the bleeding, if any, would have occurred at the puncture site, which would have been immediately apparent, likely before Ronnie was even discharged. Conversely, Dr. Thota theorized that the catheterization

15

incision site was proper, that hemostasis had occurred before Ronnie was discharged, that a spontaneous blood clot or tear occurred later in the day, that Ronnie's retroperitoneal bleed was the result of his failure to timely return to the hospital as directed in the discharge instructions, and that Ronnie would have never suffered such massive bleeding if he had timely returned to the hospital.

As to appellees' theory of Ronnie's alleged contributory negligence, they assert that Ronnie had a duty to follow Dr. Thota's instructions, which included a duty "to return for evaluation and possible treatment if complications arose post-discharge." Dr. Thota requested the submission of Ronnie's negligence, despite the fact that Dr. Thota specifically testified that he did not blame Ronnie for what had happened.[5] According to Dr. Thota, Ronnie's massive bleed was the result of a natural blood clot event or tear that worsened only because of Ronnie's delay in returning to the hospital. Dr. Thota provides no evidence of Ronnie's contributory negligence in *causing* the tear. Regardless, Dr. Thota's premise is based upon Ronnie's alleged negligence occurring *after* the tear, not Ronnie's negligence in *causing* the tear. The evidence supporting

---

[5] Appellees also placed significant blame on appellant for her failure to assist or insure that Ronnie returned to the hospital timely; however, appellees did not request a charge on appellant's alleged contributory negligence. Because it was not submitted to the jury, we do not consider appellant's alleged negligence in our analysis. *See Barker v. Eckman*, 213 S.W.3d 306, 313 (Tex. 2006); *Moore v. Kitsmiller*, 201 S.W.3d 147, 153 (Tex. App.—Tyler 2006, pet. denied).

Dr. Thota's theory of Ronnie's contributory negligence blames Ronnie *only* for his breach of duty in failing to follow Dr. Thota's discharge instructions, which he contends resulted in the increased bleeding. Indeed, a review of the evidence shows that Dr. Thota's theory was that no party was responsible for a new or naturally formed blood clot and tear but that all of Ronnie's damages were a result of Ronnie's failure to timely return to the hospital. Again, contributory negligence goes to the proximate cause of the original incident, and mitigation arises from an injured party's duty to act reasonably in reducing his damages. *See Hygeia Dairy Co.,* 994 S.W.2d at 226. Thus, Dr. Thota points only to Ronnie's *subsequent* negligence that might have increased his damages as opposed to Dr. Thota's original negligence. Therefore, we conclude that Ronnie's negligence, if any, only increased the damages he suffered after the catheterization or tear, as opposed to causing the "injury," "accident," or "occurrence" itself. *See Moulton,* 414 S.W.2d at 448–49; *Hygeia Dairy Co.,* 994 S.W.2d at 225.

**Response to Dissent**

The dissent first contends that we have erroneously described Ronnie's injury as being the tear in his right external iliac artery. Instead, the dissent contends that the injury was the extensive bleeding from the puncture site. This contention stands the whole trial on its head by allowing a defensive

17

issue—the plaintiff's alleged failure to mitigate his damages—to trump the plaintiff's entire theory of the case—the defendant's negligence in placing the catheterization stick too high. The extensive bleeding and the resulting "cascade of complications" are first the result of the negligent injury; the plaintiff's alleged failure to timely return and seek medical intervention only increased the damages the plaintiff suffered as opposed to causing them. When the dissent says that the "'tear' was relevant only because Dr. Walker's report stated that he repaired a 'tear' in Young's artery after Young returned to the hospital," it totally undermines the sole theory of the plaintiff's case and the case that was tried to this jury. An appellate court cannot decide a case on a theory different from the one that was pled and tried to the jury. *Loera v. Interstate Inv. Corp.*, 93 S.W.3d 224, 228 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

In support of the majority's position on what injury the plaintiff was actually suing for we note the following. A review of Paragraph 4.4 of Plaintiff's Fourth Amended Petition states quite clearly, "Unfortunately, Defendant Thota had torn the right iliac artery during the cardiac catheterization, and had discharged Mr. Young from the hospital while he was still bleeding internally." And in paragraph 5.1 it states, "Dr. Walker operated on Mr. Young to repair a bleed from the iliac artery which had been lacerated

18

and torn by Defendant Thota during the catheterization . . . ."  And in paragraph

VI it states that Defendants Thota and NTCC were negligent in their treatment

in that they

> c.    negligently lacerated the right iliac artery during the
>       catheterization;
> d.    failed to make a puncture at the correct location in the
>       femoral artery; [and]
> e.    failed to discover the tear in the artery prior to
>       discharging him from the hospital.

Furthermore, the term "injury" was not given a special definition in the

charge.  The only general direction regarding the use of terms and words in the

charge was in paragraph seven which said, "When words are used in this

charge in a sense that varies from the meaning commonly understood, you are

given a proper legal definition, which you are bound to accept in place of any

other meaning."  *See Kroger Co. v. Brown,* No. 14-06-00510-CV, 2008 WL

2841615, at *2 (Tex. App.—Houston [14th Dist.] July 24, 2008, no pet.).

Because the word "injury" was the word used in the charge and because it was

not given a special meaning within the charge, we are to use its common

meaning in light of the case that was tried.  The case the appellant tried was

limited to one theory: the alleged negligence of Dr. Thota in placing the

catheterization stick too high; this was the injury the plaintiff alleged, and the

bleeding was the result of that injury.

19

The focus of the trial was on what caused the tear. Again, the dissent boldly says, "There [is] no evidence that Dr. Thota caused the tear or that its existence was a causal factor in any of Young's bleeding or subsequent complications." The actual record, and all the experts, even Dr. Thota, agree and concede that wherever the tear was, that was the puncture site; that the tear location and the puncture site were one and the same; and that it was the site of the bleed. Ronnie's entire claim revolved around whether the stick was too high.

The dissent says the tear or stick cannot be the "injury." Instead, it says the "injury" is the extensive bleeding from the puncture site into Ronnie's retroperitoneal cavity. While it is true this happened, the extensive bleeding is more in the nature of the resultant damage; the "tear" is the "injury" and the "bleed" is the resultant damage. But for the tear, there would have been no bleed and therefore no damages. Again, "negligence that merely increases or adds to the extent of the loss or injury occasioned by another's negligence is not such contributory negligence as will defeat recovery" but is in the nature of negligence that contributes to the damages sustained instead. *Kerby*, 503 S.W.2d at 528. Importantly, Dr. Thota's only theory of liability asserted against Ronnie is his failure to timely seek medical advice; Dr. Thota concedes the tear was at the puncture site, that Ronnie did not cause the tear, and that

20

Ronnie's only misdeed was his failure to return to the hospital or to call Dr. Thota. Even if we, as the majority, concede that *as to Dr. Thota's defensive theory the only injury is the bleed,* this concession that the injury as to Ronnie was the tear and the injury as to Dr. Thota was the extensive bleed would prove only that there were two different theories of liability tried.

The dissent says this case is more closely analogous to *Elbaor*. Again, we disagree as shown by our discussion above. In *Elbaor*, but for the patient's refusal to take antibiotics, she would more likely than not have ever gotten an infection, which occurred and caused her further injuries weeks, months, and years after her initial car accident. 845 S.W.2d at 242. Here, the "injury" (or if one prefers to call it the "accident" or "occurrence") is the tear; it occurred that morning during the catheterization procedure, and the bleed occurred within hours of Ronnie's dismissal. The bleed would have occurred with or without Ronnie's delay in seeking medical advice; he would have required surgery to repair the tear regardless. Dr. Thota never claimed that Ronnie caused the tear; there was only a claim that his damages would have been far less significant had he sought medical intervention sooner.

In *Elbaor*, the patient had undergone a surgical procedure on her ankle, two post-surgery wound debridements and several hospital transfers. 845 S.W.2d at 242. The evidence at trial showed that she had been uncooperative

21

and noncompliant in taking the prescribed antibiotics and that she had been free of infection post operatively. *Id.* Her conduct contributed directly to her new injury—her infected ankle. *Id.* But for her refusal to take the medicine, there may have been no infection. *Id.* Conversely, in Ronnie's case, his failure to timely seek medical intervention was the basis for the increased bleeding, but it did not even cause the bleeding. It was the tear that caused the bleeding. And the bleeding is the sole basis of Dr. Thota's claim back against Ronnie; it quite simply is in the nature of Ronnie's failure to mitigate.

The dissent also contends that there is ample evidence of Ronnie's contributory negligence due to his failure to return to the hospital sooner. While we acknowledge that patients owe a duty of cooperation to treating physicians who assume a duty of care for them and that such a duty includes a duty to return for evaluation and treatment, that duty does not justify the submission of Ronnie's negligence in contributing to the injury; it merely justifies a question on his failure to mitigate his damages. *See Jackson v. Axelrad*, 221 S.W.3d 650, 654 (Tex. 2007); *Gross v. Burt*, 149 S.W.3d 213, 225–27 (Tex. App.—Fort Worth 2004, pet. denied). Again, Ronnie's failure to return did not cause the tear, which was Ronnie's theory of Dr. Thota's negligence. Ronnie's failure to return to the hospital only increased his bleeding and therefore his damages. *See Kerby*, 503 S.W. 2d at 528 (stating, "Negligence that merely

22

increases or adds to the extent of the loss or injury occasioned by another's negligence is not such contributory negligence as will defeat recovery").

Additionally, the dissent makes note of our interchange of the terms, "injury," "accident," or "occurrence." This is a red herring that makes no difference. We clearly acknowledge that the charge controls, and it used the term "injury." We have used the other terms only when citing other cases that used "accident" or "occurrence" in their charges.

The dissent also boldly states, "Young did not die from the complications and systems failures that followed cardiac catheterization by Dr. Thota," as if his failure to die absolved the defendants from liability for the survival action that appellant brought; she was pursuing a survival action on behalf of her husband's estate for the torturous life he endured from the time of Dr. Thota's catheterization until he died. *See* Tex. Civ. Prac. & Rem. Code Ann. §71.021 (Vernon 2008); *Pack v. Crossroads, Inc.,* 53 S.W.3d 492, 515–16 (Tex. App.—Fort Worth 2001, pet. denied).

For all of these reasons, we conclude and hold that the trial court abused its discretion by submitting Ronnie's alleged contributory negligence to the jury instead of giving the jury an instruction on Ronnie's duty to mitigate his damages. We therefore sustain the part of appellant's second issue challenging the submission of Ronnie's contributory negligence.

Now we must conduct a harm analysis on the erroneous submission of the jury question on Ronnie's contributory negligence.

**Harm Analysis**

Generally, the rules of appellate procedure provide two bases for reversing an error of law. Tex. R. App. P. 41.1, 61.1; *Harris County v. Smith*, 96 S.W.3d 230, 234 (Tex. 2002). The error must be one which "probably caused the rendition of an improper judgment"—44.1(a) and 61.1(a)—or the error must be one which "probably prevented the petitioner [appellant] from properly presenting the case to the appellate courts"—41.1(b) and 61.1(b). Tex. R. App. P. 41.1, 61.1. *Casteel's* "presumed harm" charge analysis has been limited to charge error in which erroneous theories of liability or damages were mixed with valid theories and the reviewing court was unable to determine whether the improperly submitted theories formed the sole bases of the jury's verdict or damages. *Harris County,* 96 S.W.3d at 235–36; *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000). However, when the error simply involves erroneous submission of inferential rebuttal instructions, *Urista* tells us that we must show that the error caused rendition of an improper judgment. *Bed, Bath and Beyond v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006); *see also Torres v. Tessier*, 231 S.W.3d 60, 63 n.2 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

24

Here, there were two competing theories of liability submitted within one broad-form liability question that asked of the two primary actors' potential liability: one was valid and the other invalid. Thus, *Casteel*'s presumed harm analysis applies. *Casteel,* 22 S.W.3d at 388–89. The jury's answers, finding no negligence attributable to Dr. Thota and all the negligence attributable to Ronnie, commingled valid and invalid theories of liability because there was no evidence of Ronnie's negligence in causing the tear and no claim by Dr. Thota that Ronnie's negligence caused the tear. While one might argue that we, as the appellate court, can still affirm the jury's verdict because it might have found that Dr. Thota was not negligent, when looking at the jury charge in its entirety as we must, we cannot know if the jury truly found Dr. Thota not negligent or whether the jury excused any negligence attributable to Dr. Thota because of properly submitted inferential rebuttal instructions. Therefore, to answer this question, we must also evaluate the propriety of the challenged inferential rebuttal instructions; if the inferential rebuttal instructions were erroneously submitted as well, then the jury's no liability finding could also have been based on an incorrect theory. *See id.* at 389 (stating, "It is essential that the theories submitted be authorized and supported by the law governing the case . . . [and i]f they are not, the appellate court must, at a minimum, be able

25

to determine whether properly submitted theories constituted the basis of the jury's verdict").

**Unavoidable Accident**

The court gave this defensive instruction as to both Dr. Thota's and Ronnie's potential negligence. "An unavoidable accident is 'an event not proximately caused by the negligence of any party to it.'" *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995); *TXI Transp. Co. v. Hughes*, 224 S.W.3d 870, 905 (Tex. App.—Fort Worth 2007, pet. granted) (quoting *Dallas Ry. & Terminal Co. v. Bailey*, 151 Tex. 359, 250 S.W.2d 379, 385 (1952)). Usually, this instruction is included when there is a question of some physical condition or circumstance that might obviate the necessity of finding that some party is negligent. *Reinhart*, 906 S.W.2d at 472. This instruction is also given when the evidence shows that the event was caused by some "nonhuman condition and not by the negligence of any party to the event." *Hill v. Winn Dixie Tex., Inc.*, 849 S.W.2d 802, 803 (Tex. 1992). Typically, it is used when some environmental condition such as fog, snow, sleet, wet or slick pavement, or some obstruction of view is involved. *Id.* Courts have also previously approved of an instruction in situations of "unexpected catastrophe" or some "peculiar circumstance" other than the negligence of the parties. *Id.* "Courts should refrain from submitting an unavoidable accident instruction in other

26

circumstances due to the risk that the jury will be misled or confused by the perception that the instruction represents a separate issue distinct from general principles of negligence." *Id.*

While historically permitted in the medical malpractice arena, Texas courts have required a defendant to "first present evidence that the event was caused by some condition other than the negligence of the parties." *Crawford v. Hope*, 898 S.W.2d 937, 941 (Tex. App.—Amarillo 1995, writ denied). Only if the defendant comes forward with such evidence would a court be required to submit this inferential rebuttal question in its charge. *Id.* A trial court does not abuse its discretion by submitting the instruction if there is any evidence to support it. *Kerr v. Brown*, No. 07-05-00043-CV, 2007 WL 613847, at *2 (Tex. App.—Amarillo Feb. 28, 2007, pet. denied).

In this case, Dr. Thota presented some evidence that the tear in Ronnie's artery could have been a natural result of some of Ronnie's diseases or could have come from a blood clot that formed and broke away from the puncture site. The trial court could have determined that this was an unexpected catastrophe or event, and although a human condition, not a human condition caused by the negligence of either one of the parties. Therefore, we conclude that the trial court did not abuse its discretion by submitting the unavoidable accident instruction as to both Dr. Thota and Ronnie and that this instruction

would have no effect on our harm analysis regarding the erroneous submission of Ronnie's contributory negligence. *See generally Dillard v. Tex. Elec. Co-op.*, 157 S.W.3d 429 (Tex. 2005).

**New and Independent Cause**

Only Dr. Thota received the benefit of a new and independent cause inferential rebuttal instruction. This instruction is required only when the evidence shows that "an act or omission of a separate and independent agency which destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes in itself, the immediate cause of such injury" has occurred. *Hall v. Huff*, 957 S.W.2d 90, 95 (Tex. App.—Texarkana 1997, pet. denied). It is not an affirmative defense but is a factor to be considered by the jury in determining whether proximate cause exists. *James v. Kloos*, 75 S.W.3d 153, 161 (Tex. App.—Fort Worth 2002, no pet.). In connection with an instruction on new and independent cause, a defendant must show that the intervening cause destroys the causal connection between the defendant's alleged negligence and the resultant injury. *Kloos*, 75 S.W.3d at 161; *Huff*, 957 S.W.2d at 95.

In *Kloos,* we stated that

Texas courts distinguish between a new and independent cause and a concurrent act. A concurrent act cooperates with the original act in bringing about the injury and does not cut off the liability of the original actor. A new and independent cause,

28

> sometimes referred to as a superseding cause, however, is an act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury complained of . . . . An intervening cause *that is reasonably foreseeable by the defendant,* though, is not a new and independent cause that breaks the chain of causation.

75 S.W.3d at 161 (citations omitted) (emphasis added). Because a new and independent cause "extinguishes the liability of a party[, it] cannot arise out of an affirmative act of negligence by either the plaintiff or the defendant." *Biaggi v. Patrizio Rest., Inc.*, 149 S.W.3d 300, 305 (Tex. App.—Dallas 2004, pet. denied). It is also clear that "merely guessing at possible causes" is insufficient; medical expert testimony that goes "no further than to testify that certain intervening events *could have caused*" an injury is "equivocal testimony" that is insufficient to warrant an instruction on new and independent cause. *Hersh v. Hendley*, 626 S.W.2d 151, 157 (Tex. App.—Fort Worth 1981, no writ) (emphasis added).

Here, the trial court instructed the jury, as to Dr. Thota only, that a new and independent cause may be the "act or omission of a separate and independent agency, not reasonably forseeable by a cardiologist . . . that destroys the causal connection . . . and thereby becomes the immediate cause of such injury." All parties agreed to the standard of care for a cardiologist performing a catheterization: to insert the needle and catheter into the right femoral artery, as opposed to the right external iliac artery. The issue here was

29

not what the appropriate standard of care was but whether Dr. Thota breached that standard and whether that breach was what caused Ronnie's retroperitoneal bleed. The evidence, including the evidence provided by the surgeon who repaired the bleed, was that the arterial tear and hematoma occurred at the puncture site in the external iliac artery. This evidence was corroborated by Dr. Sudarshan, Dr. Thota's partner who helped care for Ronnie that night, and by Dr. Doherty, appellant's expert witness.

Moreover, Dr. Thota specifically agreed that the bleeder site had to be at the original puncture site; he simply claims that the tear was a result of a dislodged clot and that the extensive bleeding was the result of Ronnie's failure to return. While Dr. Doherty concedes that it is a *possibility* that a clot over the site could have dislodged, there is no evidence that this was what actually happened; a possibility is not enough. *See id.* at 157.

Regardless, both subsequent dislocation of a clot over the puncture site and bleeding from the puncture site are foreseeable risks in a catheterization procedure. Thus, neither is a new and independent cause but rather a potential concurring cause. Therefore, we hold that it was error to submit an instruction on new and independent cause on either of these theories as to Dr. Thota.

Appellees also argue that the claimed failure of both Ronnie and appellant to timely seek medical intervention after the procedure constituted a new and

30

independent cause.  However, as noted above, we may not look to or consider appellant's claimed negligence in not assisting her husband with timely seeking medical help after the procedure, and we may not consider Ronnie's claimed negligence because his negligence would not be that of a nonparty or a third person.  Moreover, we cannot say that a patient's failure to follow discharge instructions is a new and independent cause because such a failure is also reasonably foreseeable.  *See Knoll v. Neblett,* 966 S.W.2d 622, 634 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).  Therefore, we conclude and hold that the trial court abused its discretion by submitting an instruction on new and independent cause in connection with Dr. Thota's alleged negligence. We now return to our harm analysis.

Our question now becomes, what is the effect of an improperly submitted contributory negligence question with a properly submitted negligence question in conjunction with a properly submitted unavoidable accident instruction and an improperly submitted new and independent cause instruction?  In other words, which harm analysis do we apply when we have hybrid charge error? Are we to apply the presumed harm test of *Casteel* to the *improperly* submitted jury question on Ronnie's contributory negligence yet apply the traditional harm analysis of *Urista* to the incorrectly submitted instruction on new and independent cause?  *Urista*, 211 S.W.3d at 756–57; *Casteel*, 22 S.W.3d at

31

389. We believe the answer can be found in the supreme court's own words, "[A]lthough harm can be presumed when meaningful appellate review is precluded because valid and invalid theories or damage elements are commingled [*Casteel*], we are not persuaded that harm must likewise be presumed when *proper* jury questions are submitted along with improper inferential rebuttal instructions." *Urista*, 211 S.W.3d at 757 (emphasis added). The *Urista* court's use of the words, "*proper* jury questions," is key to the analysis here; in *Urista* the sole negligence theory—that of the defendant's negligence—*was properly* submitted. *Id.* Thus in *Urista*, there was only one negligence theory submitted and it was proper, so the erroneous submission of the inferential rebuttal instruction was easily determined to be harmless in light of the entire state of the evidence and the charge. *Id.* Here, however, the jury was not only given an erroneous defensive instruction on new and independent cause that benefitted only Dr. Thota but also an erroneous jury question on liability—Ronnie's contributory negligence—a theory not supported by the evidence. So, we should not be limited to *Urista's* traditional harm analysis when trying to determine the impact of the improperly submitted instruction on new and independent cause when combined with the improperly submitted question of Ronnie's contributory negligence. We simply cannot determine, on this evidence, whether the jury properly found Dr. Thota not negligent, properly

found that his negligence was excused based upon the unavoidable accident instruction, or improperly found that his negligence was excused based upon the new and independent cause instruction alone or combined with its improper finding of Ronnie's negligence.

**Response to Dissent's Critique of Our Harm Analysis**

Now, in response to many of the claims made by the dissent, we do not agree that the jury "separately" and clearly found "no" as to whether any negligence of Dr. Thota was a proximate cause of Ronnie's injury. It was a broad-form liability submission question that erroneously submitted one proper liability question (Dr. Thota's) and one improper liability question (Ronnie's) and obscured the effect of such an erroneous question with the submission of at least one erroneous defensive instruction that was completely at odds with the facts of the case, the evidence submitted, and the battle fought by the experts in the case. More importantly, the submission fails to track the pleadings of the case and the evidence and theories that were actually pursued during the trial of the case.

The dissent says that the majority has sua sponte incorrectly applied *Casteel's* "presumed harm" analysis *even if we assume the trial court erred in submitting* the question of Ronnie's contributory negligence and giving Dr. Thota an inferential rebuttal instruction on new and independent cause.

33

However, it is not just that combination that requires us to presume harm but the incorrect submission of one correct theory of liability—Dr. Thota's negligence—with one incorrect theory of liability—Ronnie's alleged contributory negligence—which, according to *Casteel*, when submitted in one broad-form liability instruction requires us to presume harm. 22 S.W.3d at 389. Because Ronnie's theory of negligence against Dr. Thota is based upon the tear and because Dr. Thota's theory of negligence against Ronnie is based upon Ronnie's failure to timely seek medical help, it is quite clear that Ronnie's alleged contributory negligence could not have avoided Dr. Thota's initial negligence; it could only have reduced the damages Ronnie suffered.

The dissent also contends that we are reversing on unassigned error apparently just because appellant's brief does not specifically cite to *Casteel*. Her brief does, however, cite *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003) and quite plainly focuses on its primary point on appeal:

> [B]ecause this instruction (unavoidable accident) was premised on a different 'injury' (an alleged clot breaking loose) than were the 'contributory negligence' question and 'new and independent cause' instruction, it is a near certainty that it served to confuse the jury such that it led to the rendition of an improper judgment.

Appellant also noted in her original briefing, "The submission of this instruction probably caused the rendition of an improper judgment," also citing *Wal-Mart*.

34

Thus, we believe the issue of the correct harm analysis to apply to properly preserved charge error is properly before us.

Next, the dissent also contends that solely because contributory negligence is an affirmative defense it is not its own theory of liability and that we are wrong when we hold that the first jury question combines a proper liability question (Thota's negligence) and an improper liability question (Ronnie's contributory negligence). Remarkably, the dissent itself bases its theory of Ronnie's negligence on his breach of a duty to timely return to the hospital and that this is the proximate cause of Ronnie's bleeding, which the dissent says is the "injury" instead of the damages. But according to *Axelrad*, "The rules which determine the contributory negligence of a plaintiff are . . . the same as those which determine the negligence of the defendant." 221 S.W.3d at 657 (quoting Restatement (Second) of Torts §§ 289 cmt. a, 464). "[D]uty is an element of contributory negligence." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of N. Am.*, 955 S.W.2d 120, 136 (Tex. App.—Houston [14th Dist.] 1997), *aff'd*, 205 S.W.3d 692 (2000). Contributory negligence is and always has been negligence on the part of a plaintiff that is a breach of a duty, owed to oneself, that supersedes the causation of damages to oneself. *Id.* Just because it is raised as an affirmative defense does not mean it is not its own theory of liability that does not have to

be proved by the defense. Although Dr, Thota testified that he did not blame Ronnie, his defensive theory was that Ronnie did not follow Dr. Thota's discharge instructions and that Ronnie should have called Dr. Thota or returned to the emergency room earlier in the evening; that, if he had, he would not have bled as much. Dr. Thota never said that Ronnie would have never received the tear in his right iliac artery. In fact, he acknowledged that there was a tear. He even admitted it was at the puncture site, i.e., where he inserted the catheter. He just denied where that insertion was and its cause. Importantly, his theory of liability against Ronnie, however, was based solely upon Ronnie's failure to timely seek medical intervention; he says this is the cause of the extensiveness of the bleed, which is the basis of his allegation of Ronnie's negligence.

By arguing that only one theory of liability was submitted in jury question number one, albeit in two subparts, the dissent attempts to force the defense's theory of liability for injury onto Ronnie's theory of liability against Dr. Thota. In other words, the dissent attempts to force the defense's theory of injury (the extensive bleeding) on to Ronnie's theory of injury (the tear). Because these two theories of negligence were commingled in one broad-form question, one incorrect and one correct, there was harm. *See Casteel*, 22 S.W.3d at 388–89. Moreover, the incorrect submission of Ronnie's alleged contributory negligence was exacerbated by the additional incorrect instruction on new and

36

independent cause that Dr. Thota received. It is the combination of these two incorrect theories that prevents us from being able to determine whether the jury's finding of no liability as to Dr. Thota was a finding of no negligence on his part, an erroneous finding of contributory negligence on Ronnie's part, or an erroneous finding of new and independent cause.

Importantly, we are not trying to extend *Casteel's* presumed harm analysis to defensive theories; we are applying it to a single broad-form question that erroneously includes two different theories of liability. This error is only exacerbated by the erroneous defensive instruction of new and independent cause.

**Conclusion**

"[A] litigant today has a right to a fair trial before a jury properly instructed on the issues 'authorized and supported by the law governing the case.'" *Harris County*, 96 S.W.3d at 234 (quoting *Casteel*, 22 S.W.3d at 389). We therefore conclude that the trial court erred by overruling appellant's objections to the charge regarding submission of Ronnie's contributory negligence and the new and independent cause instruction. Because these instructions likely caused rendition of an improper judgment or, at least, prevented appellant from properly presenting her case on appeal, we conclude

37

that such error was harmful.  *See* Tex. R. App. P. 44.1.  We therefore reverse and remand for a new trial.

Because we have found trial court error in the charge sufficient to cause harm requiring reversal, we need not reach appellant's other issues on appeal.  *See* Tex. R. App. P. 47.1.  We reverse the judgment of the trial court and remand the cause to the trial court for a new trial.  Tex. R. App. P. 43.2(d).


                                        TERRIE LIVINGSTON
                                        JUSTICE


PANEL:  LIVINGSTON, GARDNER, and MCCOY, JJ.

GARDNER, J. filed a dissenting opinion.

DELIVERED:  November 20, 2008

38



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-05-350-CV

MARGARET YOUNG, INDIVIDUALLY AND                    APPELLANT
AS REPRESENTATIVE OF THE ESTATE OF
WILLIAM R. YOUNG

V.

VENKATESWARLU THOTA, M.D. AND                       APPELLEES
NORTH TEXAS CARDIOLOGY CENTER

------------

FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

------------

## DISSENTING OPINION

------------

I think the trial court got the jury charge right. But even assuming error in submission of both contributory negligence and the new and independent cause instruction, I disagree that the "presumed harm" analysis of *Casteel* applies. The jury separately found "no" as to whether any negligence of Dr. Thota was a proximate cause of William R. ("Ronnie") Young's injury. Examination of the entire record shows that the jury was faced with a "battle

of experts" as to Dr. Thota's negligence.  It is probable that the jury resolved the conflicts in testimony in favor of Dr. Thota in refusing to find that he was negligent.  There is no clear indication that the jury was influenced by the new and independent cause instruction.  I would hold that even if there was error in the charge, it probably did not result in an improper judgment.  Therefore, I must dissent.

## I.    BACKGROUND INFORMATION

It was undisputed that Ronnie had extensive pre-existing medical conditions including chronic obstructive pulmonary disease, cardiac disease with hypertension, and a completely occluded right coronary artery diagnosed in 1992 when he had a previous cardiac catheterization.  As the majority notes, he had also been diagnosed with polycythemia vera ("PV"), a rare, incurable bone marrow disorder resulting in overproduction of blood cells, for which he had been treated with bi-monthly phlebotomy and numerous medications, including interferon.

Ronnie presented to Dr. Thota with complaints of severe angina.  Dr. Thota recommended the second diagnostic cardiac catheterization in February 2002 to determine if a new blockage had developed.  That Dr. Thota's recommendation was reasonable and appropriate was undisputed. Preoperative laboratory studies were acceptable for Ronnie to undergo the procedure.

2

According to Dr. Cooper, Ronnie's treating hematologist before and after the procedure performed by Dr. Thota, any person with PV will have an increased risk of both bleeding and clotting complications even if everything is optimally controlled.

Ronnie did not die from the complications and systems failures that followed the cardiac catheterization by Dr. Thota. PV is a form of cancer; if a person lives long enough with it, they will develop leukemia, as Ronnie did. Ronnie was diagnosed with leukemia in October 2004 and died from that disease on March 10, 2005. His widow prosecuted this suit as a survival action on behalf of his estate.

## II. CONTRIBUTORY NEGLIGENCE WAS PROPERLY SUBMITTED.

### A. The "injury" was not the "tear" in the artery.

As a preliminary matter, I disagree that the "injury" to Ronnie that was the basis for liability sought against Dr. Thota was the "tear" in Ronnie's artery. There was no evidence that Dr. Thota caused the tear or that its existence was a causal factor in any of Ronnie's bleeding or subsequent complications. Appellant's theory of liability was that Dr. Thota incorrectly placed the puncture site for the catheterization. The "injury" was extensive bleeding from the puncture site into Ronnie's retroperitoneal cavity and the cascade of complications he suffered thereafter. The "tear" was relevant only because Dr.

3

Walker's report stated that he repaired a "tear" in Ronnie's artery after Ronnie returned to the hospital, from which the expert witnesses sought to determine the location of the puncture site.

This distinction is important. Dr. Thota's theory of Ronnie's contributory negligence was that Ronnie failed to follow his instructions to call him or to return to the hospital when he began to suffer severe pain. The majority says this conduct merely increased his injuries as opposed to causing the "accident" or "occurrence." In so doing, the majority focuses on the word "tear" to try to pinpoint the "accident" or "occurrence."

**B.     The jury was not asked about an "accident" or "occurrence."**

Despite its protestations otherwise, I believe the majority confuses "injury" with "accident" or "occurrence" in analogizing this case to *Moulton v. Alamo Ambulance Serv., Inc.*, 414 S.W.2d 444, 449 (Tex. 1967) (holding exclusionary instruction on mitigation rather than contributory negligence question proper based on plaintiff's failure to follow medical advice that merely aggravated damages received in auto accident), and *Kerby v. Abilene Christian College*, 503 S.W.2d 526, 528 (Tex. 1973) (holding trial court erroneously submitted contributory negligence instead of mitigation instruction where plaintiff's negligence in leaving van door open did not contribute to cause collision but, at most, could only have increased or added to extent of loss or

4

damage). Jury Question No. One on liability (as well as the conditioned and unanswered questions as to apportionment of responsibility and damages) did *not* ask about any "accident" or "occurrence" but expressly inquired as to whether negligence of Dr. Thota or Ronnie proximately caused Ronnie's "injury."

## C. Contributory negligence that contributed to the "injury" was properly submitted.

This case more closely resembles *Elbaor v. Smith*, 845 S.W.2d 240, 245 (Tex. 1992). Unlike the facts in *Moulton* and *Kerby*, the supreme court in *Elbaor* emphasized that the "accident" in *Elbaor* "equates to the medical problem complained of: Ms. Smith's infected ankle. Her conduct [refusing to take antibiotics as ordered] arguably did contribute to the infection. . . . [T]here might have been no infection, and thus no claim for medical malpractice, had Ms. Smith followed her doctor's instructions." 845 S.W.2d at 245. Because Dr. Elbaor pleaded that Ms. Smith was contributorily negligent in refusing to take her antibiotics and because there was evidence supporting his assertion that her refusal contributed to her injury, the court held that a contributory negligence question should have been submitted, rather than an instruction on mitigation of damages. *Id.*

5

Like the infection of Ms. Smith's ankle in *Elbaor*, any "accident" here equated to Ronnie's injury, the retroperitoneal bleeding and subsequent complications, not the "tear."  Ronnie's conduct arguably did contribute to his injury, i.e., the bleeding and subsequent consequences, like Ms. Smith's conduct in *Elbaor* and unlike that in *Moulton* and *Kerby*.

The trial court correctly followed the current Pattern Jury Charge standard questions for negligence and contributory negligence, using "injury," rather than "occurrence" or "accident" in this case.[6]  The jury question recommended by the Pattern Jury Charge provides for alternatives of "occurrence," "injury," or "occurrence or injury" in the form for submitting contributory negligence when there is evidence of a plaintiff's negligence that is injury-causing or injury-enhancing but not occurrence-causing.  Comm. on Pattern Jury Charges, State Bar of Texas, Texas Pattern Jury Charges:  General Negligence & Intentional Personal Torts PJC 4.1 & cmt. (2006); *see also* Comm. on Pattern Jury

---

[6] Appellant's brief on appeal opens with an acknowledgment that the jury charge was *not* based on the "tear" to the external iliac artery, but on the damages that resulted from the injury, the shock that resulted from the bleed, and the multiple problems that arose as the result.  Appellant now complains that the charge was based on the wrong foundation and led to an improper judgment.  We disagree for the reasons stated above.  Moreover, any complaint on this ground was waived by Appellant's failure to object to the term "injury" in Jury Question No. One.

Charges, State Bar of Texas, Texas Pattern Jury Charges: Medical Malpractice

PJC 51.1 & cmt. (2006).  The PJC Committee's comments state that

> use of 'occurrence' or 'injury'. . . could affect a case in which there
> is evidence of the plaintiff's negligence that is 'injury-causing'. . .
> but not 'occurrence-causing': for example, carrying gasoline in an
> unprotected container which exploded in the crash. . . *or failing to*
> *follow doctor's orders during recovery, thereby aggravating the*
> *injuries (post-accident negligence)*.  In such a case the jury should
> not consider this negligence in answering the [liability and
> proportionate responsibility questions] if 'occurrence' is used, while
> it should consider the negligence if 'injury' is used.

PJC 4.1 cmt. (emphasis added).[7]  The PJC comments also state that, if the

liability question for negligence and contributory negligence is submitted with

the term "injury," rather than "occurrence" or "accident," the exclusionary

instruction for mitigation of damages should *not* be submitted.  PJC 4.1, 8.9

cmt; *see also* PJC 51.1, 80.9 cmt.  Under the evidence in this case, the issue

was whose negligence, if any, caused or contributed to the "injury," not who

or what caused an "accident" or "occurrence."

> **D.    Ample evidence supported the submission and finding of**
> **contributory negligence.**

---

[7] *See also* Russell H. McMains, *Contribution and Indemnity Problems in Texas Multi-Party Litigation*, 17 ST. MARY'S L.J. 653, 676 - 77 (1986) (noting that the supreme court treated injury-causing contributory negligence and occurrence-causing contributory negligence identically in *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 429 (Tex. 1984), incorporating within the concept of traditional contributory negligence the negligent failure of a plaintiff to mitigate damages).

In *Elbaor*, the supreme court recognized a duty of cooperation that patients owe treating physicians who assume the duty to care for them. 845 S.W.2d at 245. The court held that evidence of the patient's failure to take the antibiotics prescribed for her required submission of a question on contributory negligence. *Id.* The duty to cooperate also includes the duty to return for evaluation and possible treatment if complications arise post-discharge. *See Jones v. Lurie*, 32 S.W.3d 737, 743 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (holding evidence plaintiff ignored physician's orders to remain in psychological treatment centers and hospitals factually sufficient to support 100 percent contributory negligence finding); *Eoff v. Hal & Charlie Peterson Found.*, 811 S.W.2d 187, 191 (Tex. App.—San Antonio 1991, no writ) (holding evidence factually sufficient to support 100 percent contributory negligence finding based on evidence plaintiff voluntarily left hospital before receiving emergency treatment, ignored advice of physician to return to ER, and failed to obtain medical care for seven hours after leaving hospital).

Ronnie had previously undergone a cardiac catheterization and was aware of normal postprocedure discomforts. He was given written discharge instructions to return if he had any of several listed symptoms, including "pain" or "any problems." In his deposition, Ronnie admitted he experienced a severe

8

pain in his groin at 6:00 p.m., so severe he had to bend over and hold himself, and that it was obvious to his eleven-year-old son, who reported to his mother that Ronnie "went down." He testified that shortly afterwards, he felt worse and experienced backache and nausea.

Those symptoms were different from what Ronnie had experienced after his first catheterization. By 9:00 p.m., he was hurting so much in his back and stomach that he could not get out of his recliner when his wife got home. The pain worsened until he fell out of the recliner in "excruciating pain" at about 11:00 p.m., screamed to his wife, and lay in a fetal position. Despite the progression of symptoms, Ronnie did not call Dr. Thota or seek help and, even at 11:00 p.m., refused his wife's pleas to call a neighbor or 9-1-1. According to the ambulance records, it was 12:43 a.m. when they received the call to respond.

Dr. Thota testified that, with the knowledge Ronnie possessed about his condition as well as from his prior cardiac catheterization, he should have called for help by 6:00 p.m. Dr. Doherty agreed that, with the problems of nausea and backache Ronnie was experiencing, sometimes referred to as "flank pain," Ronnie should have called for help at 6:00 p.m. or at least by 9:00 p.m. Dr. Doherty further testified on cross-examination that, based upon his review of

9

the cath log notes, Dr. Thota's notes, and those of the nurses who cared for Ronnie after the procedure, there was a ninety-nine percent chance that Ronnie was not bleeding when he was discharged at 2:40 p.m. Dr. Doherty believed the bleeding started at about 9:00 p.m. and stated Ronnie had lost three units of blood by the time he got to the operating room. If Ronnie had gone to the hospital, sought medical care, or called Dr. Thota at 6:00 p.m., or even by 9:00 p.m., Dr. Doherty said, he likely would have avoided or lessened all of the serious complications, including the shock leading to the coagulopathic state that led to the additional problems, including Ronnie's gangrenous gallbladder, which required five months of hospitalization and recovery.

Dr. McCracken, Appellant's causation expert, also acknowledged that Ronnie probably would not have experienced any of the complications if the bleeding had been recognized earlier and treated. Moreover, Dr. Doherty agreed that if Ronnie had gone to the hospital at 6:00 p.m., he could have had the "bleeder" repaired as it was or intravascularly with a stent, for which Dr. Thota had the necessary training.

I would hold that the trial court correctly submitted the PJC's standard jury question on negligence and contributory negligence in Jury Question No. One, rather than an exclusionary instruction on mitigation of damages, that

10

there was ample evidence that Ronnie's failure to follow Dr. Thota's instructions to call or to return to the hospital if he had any problems or pain supported the submission of contributory negligence, and that Ronnie's contributory negligence was a proximate cause of his injury.

## III. HARM ANALYSIS

### A. *Casteel* "presumed error" analysis does not apply.

Even if the trial court erred by submitting both the jury question on contributory negligence and the instruction on new and independent cause, I disagree with the majority's sua sponte application of the "presumed harm" analysis adopted in *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000).[8] In *Casteel,* the supreme court held that "[w]hen a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding" because the appellant is thereby prevented

---

[8] Appellant has not complained that the submission of contributory negligence or the instruction improperly commingled theories or prevented him from properly presenting his case on appeal, and neither party has briefed the possible application of *Casteel* to this case. In effect, the majority is reversing on unassigned error, issues not raised by the appeal. *See Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998) (holding it is "axiomatic that an appellate court cannot reverse . . . absent properly assigned error").

11

from properly demonstrating the consequences of the erroneous submission on appeal. *Id.* at 389; *see also* Tex. R. App. P. 44.1(b); 61.1(b).

In *Harris County v. Smith*, the court extended *Casteel* to a broad-form question that improperly commingled damage elements when one of those elements was supported by no evidence. 96 S.W.3d 230, 235 (Tex. 2002). In *Romero v. KPH Consol., Inc.*, the court further extended *Casteel* to a single broad-form question that included a theory of liability supported by no evidence. 166 S.W.3d 212, 227–28 (Tex. 2005).

The majority says we cannot determine whether the jury truly found Dr. Thota not negligent or improperly relied on the contributory negligence submission. I disagree. The theories of negligence and contributory negligence here were not improperly "commingled." There were two separate answer lines provided to the jury to answer "yes" or "no" as to Dr. Thota and "yes" or "no" as to Ronnie. The jury answered "no" as to Dr. Thota and "yes" as to Ronnie. In contrast, in *Casteel*, the jury question instructed the jury on thirteen independent grounds of liability but requested only a single answer. 22 S.W.3d at 387. Similarly, in *Harris County*, the damages question complained of instructed the jury that it could consider various elements of damages, including an element supported by no evidence, in awarding a single amount of damages.

12

96 S.W.3d at 231. Likewise, in *Romero*, the jury was improperly allowed to apportion responsibility among the defendants in a single answer based upon either an unchallenged finding of ordinary negligence or an affirmative finding on a theory of malicious credentialing for which there was no evidence. 166 S.W.3d at 215. The jury's single answer in each of those cases is what made it impossible to determine whether the verdict was based upon the improperly submitted theory or element of damages.

Here, the negligence of Dr. Thota and that of Ronnie were submitted "separately," albeit in the same question. We are thus able to determine that the jury's finding as to Dr. Thota was not based on an improper submission of contributory negligence because there are two separate answers. Combining two questions into one with separate answer lines simply does not constitute a commingling that triggers the "presumed harm" analysis.[9]

---

[9] In *Harris County*, the court noted that the Comments to the Pattern Jury Charge have long recommended that damage elements be submitted "separately" if there is a substantial doubt as to whether there is evidence to support an element. 96 S.W.3d at 235; *see* PJC 8.02 cmt. (suggesting "use of a *separate answer line* for each element of damages might avoid the need for a new trial if the appellate court finds that one or more, but not all, of the elements lack legal or evidentiary support.") (emphasis added). Thus, surely "separately" may mean either separate jury questions or separate answer lines within the same question.

13

I also cannot agree that the jury question here submitted two competing "theories of liability." Contributory negligence is not a theory of liability; it is an affirmative defense. *See* Tex. R. Civ. P. 94. The jury question in this case was a universally used, standard broad-form submission of only one theory of liability—the negligence of Dr. Thota—along with the defense of contributory negligence, as recommended by the PJC. Comm. on Pattern Jury Charges, State Bar of Texas, Texas Pattern Jury Charges: Medical Malpractice PJC 51.3 (2006). The supreme court has never extended *Casteel* to defensive theories.

In *Bed, Bath & Beyond v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006), the supreme court noted that it had limited its holdings in *Casteel* and *Harris County* to "multiple theories of liability or multiple damage elements" and that it had "never extended a presumed harm rule to instructions on defensive theories" and refused to extend *Casteel* to the "defensive theory" of unavoidable accident, stating: "[U]navoidable accident is not an alternative theory of liability but is 'an inferential rebuttal issue. . . .'"

As to the inferential rebuttal instruction on new and independent cause, the majority recognizes that *Urista* held that improper submission of an inferential rebuttal instruction is *not* subject to the "presumed error" analysis under *Casteel*. But it then concludes that we must nevertheless presume harm

14

here because we cannot determine whether the jury improperly relied on the new and independent cause instruction alone or combined with the contributory negligence submission. I believe the majority opinion conflicts with both *Casteel* and *Urista* in applying a "presumed harm" analysis based on some hybrid theory. Even assuming that contributory negligence and new and independent cause were both improperly submitted, two errors that do not trigger a "presumed harm" analysis do not equal one that does. I think we must apply the traditional harm analysis. *See* Tex. R. App. P. 44.1(a). Under that analysis, error in the jury charge requires reversal only if, after considering the record as a whole, including the pleadings, the evidence, and the charge in its entirety, we conclude that the error probably resulted in an improper verdict. *See Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986); *Wal-Mart Stores, Inc. v. Redding*, 56 S.W.3d 141, 149 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

**B.      The traditional harm analysis applies to the jury question.**

Under *Casteel*, it is still the law that when questions are submitted in a manner that does allow the appellate court to determine that the verdict was actually based on a valid liability theory, which is the case here, the error may be harmless under the traditional harm analysis. 22 S.W.3d at 389.

"Submisssion of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial." *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995). A jury question is immaterial when its answer cannot alter the effect of the verdict. *Id*. (holding any error in submitting deceased's negligence in jury charge was harmless; once jury found defendant not negligent, its finding that deceased was negligent could not have altered effect of verdict); *see also Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749–50 (Tex. 1980) (holding potentially improper submission of defensive issues harmless when jury found for defendant on independent grounds); *Hernandez v. Atieh,* No. 14-06-00582-CV, 2008 WL 2133193, at *3, 4 (Tex. App.—Houston [14th Dist.] May 20, 2008, no pet.) (mem. op.) (holding—when finding of no liability of defendant supported by evidence—once jury found defendant not negligent, submission of additional person as responsible third party in negligence question harmless); *Hutchison v. Pharris*, 158 S.W.3d 554, 567–68 (Tex. App.—Fort Worth 2005, no pet.) (holding finding of claimants' contributory negligence harmless when jury's failure to find defendants' negligence was proximate cause of injury was supported by evidence).

   **C.    The traditional harm analysis applies to jury instruction.**

16

Likewise, to determine whether submission of an instruction probably caused an improper judgment and was, therefore, harmful error, we must examine the entire record. *Urista*, 211 S.W.3d at 757 (citing *Timberwalk Apartments Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998)); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001); *see also* Tex. R. App. P. 44.1(a). Specifically, when the record provides "no clear indication" that the jury relied upon an improper inferential rebuttal instruction, *Urista* instructs us that we must ordinarily conclude the error is harmless. 211 S.W.3d at 758–59. When, as in this case, the jury makes a negative finding as to liability and, under the evidence, could reasonably have concluded that the plaintiff failed to carry its burden to establish defendant's negligence rather than relying upon such an instruction, submission of an improper inferential rebuttal instruction is ordinarily harmless error. *Id.* at 757–59 (holding unavoidable accident submission harmless when cross-examination discredited plaintiff's claims and evidence failed to indicate result would have been different absent instruction); *Reinhart v. Young*, 906 S.W.2d 471, 473 (Tex. 1995) (holding unavoidable accident instruction harmless when ample evidence supported finding of no negligence by defendant, witnesses did not refer to term, counsel made little mention of it in closing, sudden emergency was also submitted

17

without objection, and verdict was unanimous); *Torres v. Tessier*, 231 S.W.3d 60, 64 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding sudden emergency instruction harmless when jury could reasonably have failed to find causation or damages based on credibility determinations regarding evidence without regard to instruction); *see also Eoff*, 811 S.W.2d at 193 (holding new and independent cause instruction harmless when jury found plaintiff 100 percent contributorily negligent).

**D. Any charge error was harmless in light of evidence supporting jury's finding of "no" as to negligence of Dr. Thota and in light of the entirety of the record.**

There was evidence from the medical records as well as the testimony of Dr. Thota, with which Dr. Doherty agreed, that good "hemostatis" was most likely obtained—meaning the initial bleeding from the catheterization stick had been stopped by applied pressure and a blood clot had formed, that Ronnie had no pain and a good pulse, indicating that Ronnie was stable by the time he left the hospital at 2:40 p.m., and that the "injury" complained of—extensive bleeding, shock, and multi-organ failure—did not begin until several hours after he left the hospital. Dr. Thota testified that the extensive bleeding caused by the clot being dislodged was a complication he could not predict at the puncture site where the clot had formed earlier. Dr. Doherty agreed that there

18

was an "event" that caught Ronnie's attention at 6:00 p.m. and a progressive deterioration after that time.

When Ronnie returned to the hospital's emergency room at approximately 1:15 a.m., he was seen by Dr. Thota's partner, Dr. Sudarshan. A CT scan was done, described by Dr. Sudarshan in his report as showing apparent bleeding from an external iliac artery puncture site but with a finding that the site was at "about" the iliac ligament. The operative report of Dr. Walker, who operated on Ronnie that night, described a "high tear" of the right external iliac artery that had bled into the retroperitoneal cavity, forming a large hematoma. Neither Dr. Sudarshan nor Dr. Walker testified. The experts who did testify based their opinions largely on their respective interpretations of Dr. Sudarshan's and Dr. Walker's written reports.

The testimony of those experts conflicted. Dr. Doherty testified on behalf of Appellant that the standard of care for the cardiac catheterization was to insert the needle and catheter into the right femoral artery below the inguinal ligament. In Dr. Doherty's opinion, Dr. Thota made the puncture for the cardiac catheterization in the wrong location, above the inguinal ligament into the right external iliac artery, rather than below that ligament into the femoral artery. Dr. Doherty supported his opinion by the fact of the bleeding into the

19

retroperitoneal area, which could occur with a puncture that is too high, rather than into the groin, where the bleeding could have been discovered quickly and corrected.

Dr. Thota testified on his own behalf that he met the standard of care, that he did not and could not make a stick into the external iliac artery because he would not feel the pulse at that point. *See Hersch v. Hendley*, 626 S.W.2d 151, 155 (Tex. App.—Fort Worth 1981, no writ) (holding defendant physician's own testimony may establish standard of care). He further testified that a retroperitoneal bleed can happen with a femoral artery stick as well as an iliac artery stick. He pointed out that Dr. Sudashan's finding that the puncture site was at "about the inguinal ligament" would indicate that the puncture site was correct, and further testified that Dr. Walker's report was ambiguous in reference to what he repaired and where, referring to the inguinal "area"—a vast area that covers the groin—rather than "ligament." Dr. Thota further pointed out that Dr. Walker's operative report did not describe the "tear" or how he repaired it. Dr. Doherty also admitted that Dr. Walker's operative report stated that he had to divide the inguinal ligament before he could actually see the site of the tear in the artery. Dr. Thota testified that, based on that location

20

of the site of the bleeding, i.e., under the inguinal ligament, the puncture site for the cathetrization was in the correct area.

Both Dr. Thota and Dr. Doherty testified that, if there had been an improper high stick preventing adequate hemostasis, Ronnie would likely have developed signs of bleeding before discharge. But Ronnie remained stable and experienced no pain or signs of bleeding after the procedure and for several hours after his discharge. Dr. Thota testified, and even Dr. Doherty acknowledged, that the objective evidence in the records indicated that Ronnie was not bleeding at the time he was discharged, from which the jury could reasonably infer that the puncture location was not improper.

As in many medical malpractice cases, the record consists of conflicting opinions of experts. *See, e.g., Cruz ex rel. Cruz v. Paso Del Norte Health Found.*, 44 S.W.3d 622, 646 (Tex. App.—El Paso 2001, pet. denied) (holding failure to find nurse negligent not against overwhelming weight of evidence when opinions of experts for both parties conflicted); *Magee v. Ulrey*, 993 S.W.2d 332, 336 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding failure to find physician negligent not against overwhelming weight of evidence when jury could have believed defense expert); *Crawford v. Hope*, 898 S.W.2d 937, 942–43 (Tex. App.—Amarillo 1995, writ denied) (noting "battle of

21

experts" in suit against physician and holding weight of evidence was for jury to evaluate and jury's failure to find proximate cause not against overwhelming weight of evidence). In a battle of competing experts, it is the sole prerogative of the jury to determine the credibility and weight of the witnesses. *Cruz*, 44 S.W.3d at 646.

Because of (1) the ambiguity of Dr. Walker's report, (2) the fact that Dr. Doherty's opinions were based primarily on that report, and (3) the conflicting testimony of Dr. Thota and Dr. Doherty based on their respective interpretations of the report as to whether Dr. Thota did or did not place the needle and catheter in the wrong location, the jury could reasonably have resolved the credibility issues by disbelieving Dr. Doherty's opinions and by believing Dr. Thota's and could reasonably have found that Appellant failed to carry her burden of proof on establishing the negligence of Dr. Thota. Once the jury answered "no" that any negligence of Dr. Thota proximately caused Ronnie's injury, he was exonerated, and neither a "yes" nor a "no" answer as to the contributory negligence of Ronnie could have altered the verdict. *See Alvarado,* 897 S.W.2d at 752–53.

Moreover, nothing in the record "clearly indicates" that the jury relied upon the new and independent cause instruction. The jury was free to

disbelieve the expert testimony of Dr. Doherty, to accept that of Dr. Thota, and to conclude that Dr. Thota did not incorrectly place the puncture site for the catheterization. We presume that the jury decided all questions of credibility and conflicts in the evidence in favor of the verdict if reasonable jurors could have done so. *Torres*, 231 S.W.3d at 63–64 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005)). The jury could reasonably have found Dr. Thota not negligent without reaching the issue of proximate cause, in which event the jury would not have relied on the new and independent cause instruction because that instruction relates only to proximate cause. *See Arguelles v. Kellogg Brown & Root, Inc.*, 222 S.W.3d 714, 727 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (noting "new and independent cause" is component of proximate cause). Additionally, the jury's answer of "yes" as to Ronnie's contributory negligence as a proximate cause negates any reliance by the jury on the instruction. *See Eoff,* 811 S.W.2d at 193 (holding new and independent cause instruction contemplates independent force rather than negligence of parties was responsible for injuries). Finally, counsel for Dr. Thota never even mentioned the instruction in his closing argument. I would hold there is no indication, much less any "clear indication," that the jury relied on that instruction in reaching its verdict. *See Urista*, 211 S.W.3d at 758–59.

Thus, even if there was charge error, under the proper harm analysis I would hold that the record fails to establish that any such error probably resulted in an improper judgment.  *See* Tex. R. App. P. 44.1(a).  I would affirm the judgment of the trial court.


ANNE GARDNER
JUSTICE

DELIVERED:  November 20, 2008