COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH


NO. 2-09-013-CV

LAURA HALL SOLOMON                                                    APPELLANT

V.

T & M CONTRACTORS, INC.                                              APPELLEE
D/B/A T & M CONSTRUCTION

------------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

The trial court denied Appellant Laura Hall Solomon's motion for new trial
in her negligence suit against Appellee T & M Contractors, Inc. d/b/a T & M
Construction ("T&M"), and she now appeals.  In one issue, Solomon argues
that the trial court erred by denying her motion for new trial because the jury's

------------

[1]... *See* Tex. R. App. P. 47.4.

verdict was against the great weight and preponderance of the evidence. We disagree, and, accordingly, we affirm.

Solomon filed suit for damages against the Woods of Bedford, TMG Milestone Management, and T&M for injuries she sustained from falling into a hole at the Woods of Bedford apartment complex. She claimed that as an invitee, she was owed a duty of care by the defendants and that they were negligent by (1) creating and maintaining an unreasonably dangerous condition, (2) failing to warn her of the dangerous condition, (3) failing to place warning signs and barriers around the dangerous condition, (4) failing to correct the unreasonably dangerous condition, and (5) failing to properly maintain the premises.

Solomon settled with the Woods of Bedford and TMG Milestone Management and proceeded to trial in her suit against T&M. The jury charge asked whether T&M and Solomon were negligent, and, if so, what percentage of negligence was attributable to each. The charge instructed the jury that T&M was negligent with respect to the condition of the premises if the condition posed an unreasonable risk of harm; it knew or reasonably should have known of the danger; and it failed to exercise ordinary care to protect Solomon from the danger, by both failing to adequately warn her of the condition and by failing to make the condition reasonably safe. The jury was

2

further instructed that negligence as to Solomon meant the "failure to use ordinary care; that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances."

The jury found Solomon 80% negligent and T&M 20% negligent. The trial court entered a judgment in accordance with the jury's verdict, ordering that Solomon take nothing. Solomon filed a motion for new trial, which the trial court denied.

Standard of Review

When the party with the burden of proof appeals from a jury's failure to find, the party must show that the failure to find is against the great weight and preponderance of the evidence.[2] A complaint that a jury answer is against the overwhelming weight of the evidence must have been raised in a motion for new trial.[3] We review a trial court's denial of a motion for new trial for abuse

---

[2] *See Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

[3] Tex. R. Civ. P. 324(b)(2)–(3); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).

of discretion.[4]

When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact.[5] The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony.[6]

Analysis

Contributory negligence is negligence with a "causal connection with the accident that but for the conduct the accident would not have happened," as opposed to negligence that "merely increases or adds to the extent of the loss or injury occasioned by another's negligence."[7] In Texas, a plaintiff may be contributorily negligent and still recover, but not if her percentage of responsibility for her damages is greater than 50%.[8] The jury "is given wide

---

[4] ... *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009); *Hogue v. Propath Lab., Inc.*, 192 S.W.3d 641, 647 (Tex. App.—Fort Worth 2006, pet. denied).

[5] ... *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

[6] ... *Id.*

[7] ... *Kerby v. Abilene Christian College*, 503 S.W.2d 526, 528 (Tex. 1974); *see also Young v. Thota*, 271 S.W.3d 822, 829–30 (Tex. App.—Fort Worth 2008, pet. filed) (discussing contributory negligence and causation versus exacerbation of injuries).

[8] ... *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.001 (Vernon 2008).

latitude" in apportioning responsibility for an accident, and even if a different percentage could be allocated under the evidence, "an appellate court may not substitute its judgment for that of the jury."[9]

The jury in this case found that both T&M and Solomon were negligent and apportioned 80% of the responsibility for the accident to Solomon.[10] Solomon argues that the jury's finding was against the great weight and preponderance of the evidence because T&M failed to take measures to make the condition reasonably safe, failed to warn visitors at the complex about the dangerous holes by way of barricading the areas, and failed to give any other verbal or visual warning.

At trial, the evidence established that T&M was hired to remove the Woods' previously existing wooden carports and replace them with metal carports supported by steel beams. In order to set a new post, T&M would cut a 19"–22" square in the concrete and auger a four-foot hole inside the square. Upon leaving the work site each evening, T&M employees were supposed to

---

[9] *...* *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 659 (Tex. App.—Dallas 2002, pet. denied).

[10] *...* *See Kerby*, 503 S.W.2d at 528; *see also Elbaor v. Smith*, 845 S.W.2d 240, 245 (Tex. 1992) (holding that the trial court should have included a requested contributory negligence question in the jury charge because there was some evidence that without the plaintiff's conduct, the complained-of injury might not have occurred).

cover the holes with a four-by-four section of three-quarter-inch thick plywood and barricade the area using yellow caution tape and sawhorses or cones. The parties introduced conflicting evidence about whether this was properly done.

Solomon testified that on June 28, 2005, some time after 5:00 p.m., she drove to the apartment complex to meet her then boyfriend (now husband), daughter, and son-in-law, all of whom lived in the complex. She testified that when she arrived at the Woods on the day in question, she noticed that "there was some construction project going on" involving the replacement of parking spaces. She also testified that even before she arrived at the Woods, she was aware that construction would be ongoing because she had seen signs to that effect.

Solomon found an available parking space that was next to the space in which her boyfriend had parked his truck. She noticed in the spot a piece of plywood with nails sticking out of it. There were other parking spaces available, but Solomon decided to park in the space with the board. She testified that the parking space was not barricaded or taped off. The nails in the board were curved, but she believed they could do damage to her tires. She "possibly" could have parked in the space without driving over the board, but she decided to move the plywood before parking there. She stopped her car, got out, and lifted the plywood. Upon doing so, she stepped forward and

6

fell into a large hole that had been covered by the plywood, injuring herself. At trial, she acknowledged that she was holding the board in such a way that she could not see the ground in front of her as she walked. After her accident, she did not report what happened to anyone, never asked her boyfriend to report it to anyone, and never asked her daughter to report it to anyone.

Solomon's husband Jim testified on her behalf. He stated that after Solomon's accident, he took her to the hospital, and that when he returned, someone had covered the hole again with the same plank of wood. He did not see any caution tape or barricade marking the area.

Trey Murchison, the T&M employee in charge of the T&M work crew, testified by deposition. He stated that at the end of every work day, he made sure that the crew cordoned off any area where holes had been dug and that he had checked the area before the crew left that day. Solomon's attorney showed him a photograph taken by Carol Harms, the fiancée of a resident of the complex. The photograph showed a parking space with a piece of plywood in it that had no barricading or caution tape marking it off. When shown the picture, Murchison acknowledged that no barricades were visible in the picture but testified that such a hole is still secure as long as the plywood is covering it. T&M's owner, Tim Giles, was also asked about the picture. He stated that the only time that the area was not barricaded or taped off was while his crew

was working.  He asserted that Harms's picture showed no barricades or tape because it was taken while the crew was there working.

Murchison further testified that on the day of Solomon's injury, he received a call from Giles telling him that someone had reported an accident. He testified that he met the apartment complex maintenance man, Brian James, and the two men inspected the area where holes had been dug that day and found no uncovered holes and no evidence of an accident.  When he went to the site, he saw that the barricades, cones, and plywood were all still in place.

Lisa Crumpton, the community director of the Woods, testified that on the day of Solomon's accident, a contractor in the complex to do countertop refinishing came into the office and mentioned an accident had occurred out on the property.  He did not give an exact location or name of the injured person. Based on that report, Crumpton went out onto the property to see where the accident might have happened, but she did not see anyone or any problem. She called James and someone with T&M to report the possibility of an accident.  She testified that no one ever contacted the office to report Solomon's accident.  She further stated that she periodically inspected the property during the time construction was ongoing and that she never saw any areas that should have been barricaded but were not.

James testified that he and Murchison inspected the area after learning that an accident had occurred and that he did not see any holes uncovered. He further testified that he had never seen any areas that had not been properly cordoned off during the time of the construction. He testified that there were, however, some holes in the street, that those were covered with plywood, and that some of those did not have barricades.

Tommy Woodell, a former resident of the Woods, and Harms, his fiancée, testified by deposition. Woodell testified that he is involved in his own lawsuit resulting from injuries he allegedly suffered from falling into a hole in the parking lot two days before Solomon's accident. Both Woodell and Harms testified that Woodell was injured when the two attempted to move a piece of plywood in a parking space with nails sticking out of it. Both testified that it was next to a space in which a neighbor with young children often parked, and that because they did not want anyone to get hurt by the nails, they decided to move the board. Harms testified that the area with the board was not surrounded by barricading or caution tape. When Woodell lifted the board and took a step forward, he fell into the hole that the board had been covering. Harms admitted that Woodell had been drinking before his accident.

Harms testified that the next day, she went out to the work crew and told the person pointed out to her as the foreman about what happened. She did

9

not describe Woodell's injuries but did tell the person that Woodell had fallen into a hole. She testified that the man must have heard her because she was about four or five feet away but that he only stared at her and did not say anything to her. That same day, Harms took photographs of the hole in which Woodell allegedly fell, the board that had been covering it, and the area around it. She took pictures of the work crew about a week later.

Both Harms and Woodell testified that they were aware of the work being done in the parking lot. Woodell testified that some areas were barricaded but that the area of the plywood-covered hole in which he injured himself was not barricaded or taped off. Harms also testified that the area was not barricaded. Woodell's accident occurred on a Sunday, and he could not say whether tape had been up around the area earlier in the day or if someone had removed the tape. When asked if he would have stepped in the hole if he had not removed the plywood, Woodell responded, "There would be no way to fall in the hole if you didn't move the plywood."

In Murchison's deposition testimony, he denied that Harms told him about Woodell's accident, testifying that he was not made aware of an incident taking place on June 26, 2005, until he received a call from Crumpton informing him that the apartment complex had received a letter from an attorney representing Woodell. Murchison testified that the company did not use plywood with nails

10

in it to cover holes and that he had never seen plywood with nails in it covering a hole at the job site. Murchison was shown a picture, taken by Harms, of a piece of plywood covering one of the holes, and the plywood had nails in it. Harms identified the board in the picture as the one that Woodell had moved. Murchison testified that he never saw such a board covering any of the holes, and if he had, he would not have allowed it because of the potential damage to his equipment. When asked by T&M's attorney, he agreed that the photograph did not show whether any of the nails actually protruded through the board.

Solomon's boss, Dr. Martin Wax, testified that she called him sometime after her accident to tell him about her injury and that she would not be coming into work the next day. He testified that she described what had happened as getting out of her car and "not hav[ing] solid ground where she exited"; that it was "a footing issue"; and that she never told him that she lifted a board and stepped into an exposed hole.

The dangerous condition was the hole. A question at trial was whether T&M had taken steps to make the condition reasonably safe. T&M contended that it used new pieces of plywood to cover the holes and that it barricaded the area surrounding the hole. It also contended that even without barricades, the hole was safe as long as the board was covering it. Woodell supported that

11

claim when he admitted that there would be no way to fall in the hole without moving the board.

Solomon argued that the hole was not made safe by T&M's efforts because the area was not barricaded and the plywood had nails in it. But it was not the nails themselves that caused Solomon's injury. Rather, it was her decision to move the board because of the nails so that she could park in the space where the board was located. She admitted at trial that other parking spaces were available and that if she had been worried about driving over nails in the board, she could have parked elsewhere without having to move the board. The picture of the nail-ridden board that Solomon used to show the reasonableness of her actions was taken the day before Solomon's accident, did not show nails protruding through the board, and was not established as being the same board later covering the hole that caused her injury. Solomon acknowledged that it was possible that she could have parked in the space without driving over the board; rather than attempt it, she made the decision to move the board. Both Woodell and Solomon testified that they would not have fallen if they had not moved the boards covering the holes. The jury also heard Solomon agree with the statement of T&M's attorney that when she picked up the board, she held it in such a way that it obstructed her view of

12

where she was walking and that "it's a good idea to be able to see where you are going and know where you are stepping before you start walking."

Solomon seems to argue that T&M should have known that covering the hole with a board with nails in it was not enough to make the area safe because by the time of her accident, another person had been injured when he attempted to move a board with nails in it, and T&M had been informed of the problem. Thus, T&M should have known that covering the holes with a board with nails would create a condition that could lead to injury. But even assuming that such knowledge would make T&M more negligent than Solomon, the jury heard conflicting testimony about what T&M knew and when, and the jury was free to accept one version and disregard another. And although Solomon contends that T&M made the condition of the hole more dangerous because a person like her would see nails protruding from the board and believe that it constituted a dangerous condition for everyone at the complex, the evidence does not support a finding that she acted out of concern that third parties might be injured. Her professed concern was for her tires.

The jury—the sole judge of the credibility of testifying witnesses[11]—heard conflicting evidence about whether T&M properly barricaded parking areas

---

[11] ... *Golden Eagle Archery*, 116 S.W.3d at 761.

13

where work was being done and whether it used new plywood or reused old plywood with protruding nails.  From the evidence at trial, the jury could have concluded that although T&M should have done a better job with safety measures and was negligent in its failure to do so, Solomon would not have been injured absent her own negligence and that she was primarily responsible for her accident.  The jury could have believed, based on the evidence presented, that Solomon was aware of construction going on involving work on the parking spaces, that she had other parking spaces available to her, that the board was not dangerous to drive over, that if she had not taken it upon herself to move the board, she could not have fallen in the hole, and that she could have avoided the accident by watching her step.  Its finding was not so against the great weight and preponderance of the evidence so as to be manifestly unjust.[12]  We overrule Solomon's sole issue.

Having overruled Solomon's sole issue, we affirm the trial court's judgment.

PER CURIAM

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED:  December 31, 2009

---

[12] *See Rosell*, 89 S.W.3d at 659 (noting that jury has wide latitude in apportioning responsibility for an accident).

14