

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-05-00350-CV

MARGARET YOUNG,
INDIVIDUALLY AND AS
REPRESENTATIVE OF THE
ESTATE OF WILLIAM R. YOUNG

APPELLANT

V.

VENKATESWARLU THOTA, M.D.
AND NORTH TEXAS CARDIOLOGY
CENTER

APPELLEES

----------

FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

----------

## MEMORANDUM OPINION ON REMAND[1]

----------

This is an appeal from a take-nothing jury verdict in a health care liability claim. Margaret Young, individually and as representative of the Estate of William R. (Ronnie) Young, sued Dr. Venkateswarlu Thota for injuries Ronnie

---

[1]*See* Tex. R. App. P. 47.4.

sustained after a cardiac catheterization procedure. In a prior opinion, this court sustained two of appellant's issues, holding that submission of two improper jury instructions was harmful, and remanded the case to the trial court for a new trial. *Young v. Thota*, 271 S.W.3d 822, 841 (Tex. App.—Fort Worth 2008), *rev'd*, 366 S.W.3d 678 (Tex. 2012). But the supreme court reversed this court's judgment, holding that any error in the submission of the two instructions was harmless. 366 S.W.3d at 696. The supreme court also directed this court to address the remaining issues in the appeal. *Id.*

## Background

In our prior opinion, we described the factual background of this case as follows:

> Appellant is Ronnie's widow. Ronnie died on March 10, 2005. Ronnie had suffered from a blood disorder called Polycythemia Vera (PV) and coronary artery disease, including hypertension and angina. His cardiologist, Dr. Thota, with NTCC (collectively "appellees"), recommended that Ronnie undergo a cardiac catheterization to evaluate his heart condition. The catheterization was scheduled for March 4, 2002 at United Regional Health Care System in Wichita Falls, Texas. Dr. Thota performed the procedure that morning, and Ronnie was discharged that afternoon. At the time, Ronnie was fifty-five years of age.

> After Ronnie began feeling poorly at home and fell from his chair around 11:45 p.m., appellant called 911, and Ronnie returned to the hospital's emergency room around 1:15 a.m. Olyn Walker, M.D. ultimately operated on Ronnie that night to repair a tear in his iliac artery and the resulting internal bleeding allegedly caused by the catheterization procedure. During the emergency surgery, Dr. Walker discovered a large hematoma from severe bleeding in the peritoneal cavity. After the surgery, Ronnie was placed on a ventilator, suffered acute renal failure that required dialysis, received multiple blood transfusions, underwent a splenectomy, and

2

underwent surgery to remove his gallbladder once it became gangrenous due to ischemia caused by the bleed. He ultimately lost vision in one eye and suffered numerous strokes and blood clots, all allegedly as a result of the negligent catheterization. Ronnie stayed in the hospital in Wichita Falls for two months and later transferred to Baylor University Medical Center (BUMC) in Dallas, Texas, on May 2, 2002. While at BUMC, he was diagnosed with and treated for thrombocytosis, sepsis, respiratory failure, depression, malnourishment, gout, deep vein thrombosis, and portal vein thrombosis. When he left BUMC, he went to Baylor Specialty Hospital for rehabilitation for an additional two months. Ronnie died on March 10, 2005, about three years after the original procedure, at the age of fifty-eight.

After Ronnie died, appellant brought suit individually and on behalf of his estate against Dr. Thota and NTCC. Appellant alleged appellees were negligent in failing to obtain an accurate medical history on Ronnie, in failing to take into consideration any of Ronnie's pre-existing conditions that might have exacerbated potential complications, in failing to properly locate the femoral artery and lacerating the right iliac artery instead during the catheterization, in failing to discover the laceration before discharging Ronnie, and in failing to properly diagnose and treat the tear.

*Young*, 271 S.W.3d at 826–27 (footnote omitted).

**Evidence Supporting Jury's Failure to Find Negligence**

In her first issue, appellant contends that the evidence is factually insufficient to support the jury's finding that Dr. Thota[2] was not negligent in his treatment of Ronnie. She also contends that she proved negligence as a matter of law.

---

[2]Appellant alleged that North Texas Cardiology Center was liable under respondeat superior. *Young*, 271 S.W.3d at 827 n.1.

3

**Standards of Review**

If a party is attacking the legal sufficiency of an adverse finding on which the party had the burden of proof, and there is no evidence to support the finding, we review all the evidence to determine whether the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

When reviewing an assertion that the evidence is factually insufficient to support a finding on which the party had the burden of proof, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

**Applicable Facts**

The standard of care for Dr. Thota was undisputed: to insert the needle and catheter into the right femoral artery, as opposed to the right external iliac artery. *Young*, 271 S.W.3d at 838. Appellant contends that all of the competent evidence at trial shows that Dr. Thota violated the standard of care by inserting the needle into the right external iliac artery and that there is no evidence that Ronnie's internal bleed was caused by anything other than Dr. Thota's insertion of the needle into the wrong artery.

According to Dr. Thota, when he performs a cardiac catheterization, he feels for a bony prominence near the groin under which is usually the inguinal ligament, and he then feels for a pulse underneath, which is the femoral artery; he said it is difficult to feel a pulse in the external iliac artery because it is too far underneath skin, fat, and muscle. He then nicks the artery in that area and passes a thin wire into the artery at that point. According to Dr. Thota, he can tell if a patient is bleeding during the procedure by changes in pulse rate and blood pressure. After the procedure, a scrub tech monitors the blood pressure and heart rate of the patient, compresses the puncture site for fifteen or twenty minutes, and, once hemostasis[3] is achieved, puts on a bandage. When hemostasis is achieved, there is no bleeding from the puncture site. The patient is discharged if after four to six hours, there is no pain, no bleeding, and blood pressure and heart rate are stable.

Dr. Thota testified that he had no difficulties inserting the catheter during Ronnie's procedure and that he placed the catheter in Ronnie's right femoral artery. He also testified that Ronnie's blood pressure and pulse rate were normal during and after the procedure. His report after the procedure noted that "at the end of the procedure, all catheters were removed. Hemostasis was obtained by manual compression without any complication." The nursing notes show that hemostasis occurred after twenty minutes. They further state that before he was

---

[3]Hemostasis is a clot forming on the puncture hole.

5

discharged, Ronnie experienced some mild pain, that his "groin site" was "okay," and that there was no evidence of bleeding.[4]

Dr. Thota's partner, Dr. Sudarshan, was on call when Ronnie came back to the hospital. His report of his visit to Ronnie that night notes that he noticed a puncture site "just about the inguinal ligament," which, according to Dr. Thota, means that the puncture was in the right place.

There is evidence that in some of the radiological studies performed on Ronnie after the catheterization, the precipitating event is listed as "right iliac artery dissection." Dr. Thota explained that if he had dissected the artery, it would have been a complete cut, which would have caused severe pain and would have caused difficulty with the catheterization procedure itself. Dr. Thota also testified that had he torn the iliac artery, he would have known immediately during the procedure because Ronnie would have had severe pain, a drop in blood pressure, and an increase in his heart rate.

Dr. Thota testified that he had read the post-operative report from Dr. Walker, the surgeon who repaired Ronnie's bleed the day after the catheterization. He noted that Dr. Walker wrote that he repaired Ronnie's "external iliac artery." Dr. Thota also said that the external iliac artery becomes the femoral artery after crossing below the inguinal ligament. According to Dr.

---

[4]The scrub tech's notes at 8:56 a.m. state, "Pressure held 20 minutes, hemostasis obtained, sterile pressure, dressing and sandbag applied. Blood pressure, vital signs, patient to the room, nurses care with no bleeding, no hematoma, no chest pain or shortness of breath."

6

Thota, Dr. Walker's report says that the puncture site for the catheterization was "above the inguinal," and that Dr. Walker did not say specifically where the puncture site was in reference to the inguinal ligament. According to Dr. Thota, the inguinal area is a large area that encompasses but does not necessarily mean the inguinal ligament. He agreed that the puncture site is where the artery is punctured with a needle so the surgeon can gain access to the artery for the catheterization and that a puncture site from the external iliac artery would be above the inguinal ligament.

Dr. Sudarshan's notes show that a "CT abdomen apparently revealed bleeding from external iliac artery puncture site." But Dr. Thota answered "No" when asked if he knew whether Dr. Sudarshan had actually reviewed the CT scan himself.

Dr. Thota testified that one of the common complications of a cardiac catheterization procedure is bleeding and that the informed consent form given to Ronnie showed "[i]njury to the blood vessels" and "hemorrhage" as risks of the procedure. Dr. Thota also testified that a retroperitoneal bleed, such as Ronnie experienced, could happen "by sticking the common femoral artery." He further stated that if he had punctured the middle of the external iliac artery, bleeding would have occurred in the cath lab itself and would not have stopped. Dr. Thota agreed with a statement from a recognized authority on catheterization procedures that "[t]he best prevention for retroperitoneal bleeding is careful

identification of the puncture site to avoid entry of the common femoral near or above the inguinal ligament."

Although in his discharge notes for Ronnie, Dr. Thota noted that Dr. Walker made a "right iliac artery repair," he explained that he was only describing what Dr. Walker said in his surgical notes.

Dr. Thota believed that the puncture site was at the junction of the common femoral and external iliac arteries, which is, in his professional opinion, a reasonable and appropriate site. Dr. Thota opined that he was not negligent and that he did not cause Ronnie's injury. Dr. Thota believed that Ronnie began to bleed after he left the hospital.

On redirect, Dr. Thota testified that he did not think a puncture site one to three millimeters above the inguinal ligament was improper and that anything higher would not allow hemostasis to be achieved. Dr. Thota clarified that he disagreed with Dr. Walker's description of where he repaired the puncture site; Dr. Thota said that instead of the right iliac artery, Dr. Walker repaired the site at the junction of the common femoral and external iliac.[5] Dr. Thota thought the repair was at that junction because Dr. Walker's surgical notes state that he made an incision extending up to, and then across, the inguinal ligament before he visualized the bleeder.

---

[5]There were two reports by Dr. Walker; the first did not mention a puncture site, but the second one did.

8

Dr. Neill Eugene Doherty, appellant's expert, testified that the external iliac artery is above the inguinal ligament. Dr. Doherty opined that Dr. Thota punctured Ronnie in the right external iliac artery above the inguinal ligament. He based that decision on three things: (1) as a vascular surgeon, Dr. Walker would have the best knowledge of vascular anatomy, (2) the CT scan taken before Dr. Walker's surgery showed a "bleed from the external iliac artery," and (3) it is much easier to detect a bleed from the femoral artery. According to Dr. Doherty, a patient could appear to have hemostasis on the surface after an iliac artery tear but still have undetected bleeding. Dr. Doherty testified that Dr. Thota did not use ordinary care in locating the femoral artery and, thus, stuck Ronnie in the wrong place. He thought the length of the procedure showed that Dr. Thota did not spend enough time locating the artery. Dr. Doherty also testified that Dr. Thota's negligence––puncturing the wrong artery––caused the retroperitoneal bleed and shock, which precipitated all of Ronnie's other injuries in the hospital.

Dr. Doherty explained that the reason Dr. Walker had to cut up to and across the inguinal ligament was to open as large a space as possible because the iliac artery is located deeper in the pelvis. In addition, Dr. Doherty testified that Ronnie's pre-existing, underlying health condition, PV, created a concern for clotting and bleeding because bleeding for such a patient could have catastrophic consequences.

Dr. Doherty agreed that, based on the notes about the procedure and Ronnie's condition afterward, there was a ninety-nine percent chance that

9

Ronnie was not bleeding when he was discharged and that discharging him that day was reasonable. He also agreed that, based on those records, there is no objective evidence Ronnie was bleeding at the time of discharge. Dr. Doherty admitted that there was a possibility that the hole clotted, and the clot was discharged and started to bleed after Ronnie left the hospital. Finally, he further agreed that the area underneath the inguinal ligament is an appropriate place to puncture the artery. Regardless, Dr. Doherty testified that in his opinion, Ronnie started bleeding while he was being monitored after the procedure, before he was ever discharged from the hospital. He testified that a retroperitoneal bleed can occur without detectable symptoms for at least twelve hours and that he would not have expected them to see any symptoms in the hospital. He said pain is a late symptom of a retroperitoneal bleed.

Dr. Joseph McCracken, a hematologist, testified that Ronnie's underlying condition made him more susceptible to bleeding and clotting complications. He agreed that Ronnie's condition at 6:00 p.m. the evening of the procedure indicated that he was not in shock at that time and that a person can go into shock syndrome in as little as thirty minutes. Dr. Barry Cooper, a hematology expert, also testified that patients with PV are prone to bleeding and clotting problems, especially during surgical procedures. He further testified that a person with PV is "more likely to clot off the . . . femoral . . . artery, if they are cannulating the artery" during a cardiac catheterization procedure.

Appellant testified that Ronnie was complaining of being in a lot of pain after the procedure but that Dr. Thota called him a "big baby" and said that it did not hurt that bad. On cross-examination, appellant said Ronnie was only in pain in the cath lab but that he was not complaining of pain by the time he was in recovery. According to appellant, he also said though that after he was discharged and she took him home, Ronnie was "tired and kind of worn out, but not hurting or anything." He slept that evening. About 9:00 that night, he was sitting in a recliner and would not go to bed. Ronnie said he was not feeling well; appellant checked the puncture site, but it looked fine. After appellant went to sleep, she was awakened by Ronnie's shout; he told her he felt "sick at his stomach" like he needed to go to the bathroom. She could not get him out of the recliner and had to call an ambulance. By the time the ambulance arrived, "he had turned real pale, [had] started sweating, [and] the color [had gone] out of his eyes."

Dr. Sudarshan's notes of when he talked to appellant in the hospital indicate that she told him Ronnie "apparently did well until around 10 p.m. when he suddenly started complaining of pain."

**Analysis**

Based on the foregoing, there is evidence supporting the jury's finding. In addition, that finding is not against the great weight and preponderance of the evidence such that the jury's verdict is manifestly unjust. The record shows conflicting, battle-of-the-expert evidence, of the type that a reasonable jury as

11

fact finder could resolve in either party's favor. *See Young*, 366 S.W.3d at 695–96. We therefore conclude and hold that the evidence is neither legally nor factually insufficient to support the jury's finding that Dr. Thota did not breach the applicable standard of care in his treatment of Ronnie. *See id.* (holding that the jury could have reasonably concluded that Dr. Thota did not breach the standard of care and that "the record supports the jury's finding of no negligence as to Dr. Thota"). We overrule appellant's first issue. Having overruled her first issue, we need not address her second. *See* Tex. R. App. P. 47.1; *Young*, 366 S.W.3d at 694 (holding that once jury found Dr. Thota not negligent, any answer to the subsequent contributory negligence question could not alter the verdict).

Having overruled appellant's remaining dispositive issue, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MCCOY, JJ.

DELIVERED:  June 20, 2013

12